```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4  SK NEXILIS CO., LTD.,          )(
        PLAINTIFF,                 )(    CIVIL ACTION NO.
 5                                 )(    2:23-CV-539-JRG-RSP
    VS.                            )(    MARSHALL, TEXAS
 6  SOLUS ADVANCED MATERIALS CO.,)(
    LTD., VOLTA ENERGY SOLUTIONS )(
 7  S.A.R.L., VOLTA ENERGY         )(
    SOLUTIONS EUROPE KFT.,         )(
 8  VOLTA ENERGY SOLUTIONS         )(
    HUNGARY KFT., AND VOLTA        )(
 9  ENERGY SOLUTIONS CANADA INC.,)(    AUGUST 21, 2025
        DEFENDANTS.                )(    8:59 A.M.
10

11                  REDACTED MOTION HEARING

12          BEFORE THE HONORABLE ROY S. PAYNE

13            UNITED STATES MAGISTRATE JUDGE

14

15  FOR THE PLAINTIFF:      Mr. John Yin
                            Quinn Emanuel Urquhart & Sullivan
16                          865 S. Figueroa Street, 10th Floor
                            Los Angeles, CA 90017
17
                            Mr. Chunmeng Yang
18                          Quinn Emanuel Urquhart & Sullivan
                            1109 First Avenue
19                          Suite 210
                            Seattle, WA 98101
20
                            Mr. Richard W. Erwine
21                          Quinn Emanuel Urquhart & Sullivan
                            51 Madison Ave
22                          22nd Floor
                            New York, NY 10010
23
                            Mr. Deron R. Dacus
24                          The Dacus Firm, PC
                            821 ESE Loop 323
25                          Suite 430
                            Tyler, TX 75701
```

```
 1   FOR THE DEFENDANTS:        Mr. Ralph A. Phillips
                                Mr. Daniel A. Tishman
 2                              Mr. Brendan F. McLaughlin
                                Fish & Richardson PC
 3                              1000 Maine Avenue, SW
                                Suite 1000
 4                              Washington, DC 20024

 5                              Mr. Tom Gorham
                                Gilliam & Smith, LLP
 6                              7232 Crosswater Avenue
                                Tyler, TX 75703
 7

 8   COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                                Official Court Reporter
 9                              Honorable Robert W. Schroeder III
                                United States District Judge
10                              Eastern District of Texas
                                Texarkana Division
11                              500 North State Line Avenue
                                Texarkana, TX 75501
12                              shelly_holmes@txed.uscourts.gov

13   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:59:46 | 1 | COURT SECURITY OFFICER:  All rise. |
| 08:59:47 | 2 | THE COURT:  Good morning.  Please be seated. |
| 08:59:50 | 3 | For the record, we're here for the motion hearing |
| 09:00:13 | 4 | in SK nexilis versus Solus Advanced Materials which is our |
| 09:00:24 | 5 | Case No. 2:23-539. |
| 09:00:26 | 6 | Would counsel state their appearances for the |
| 09:00:28 | 7 | record? |
| 09:00:29 | 8 | MR. DACUS:  Good morning, Your Honor.  Deron Dacus |
| 09:00:32 | 9 | on behalf of the Plaintiff.  And here with me are John Yin, |
| 09:00:37 | 10 | Chunmeng Yang, and Rich Erwine.  And we are ready to |
| 09:00:39 | 11 | proceed, Your Honor. |
| 09:00:40 | 12 | THE COURT:  All right.  Thank you, Mr. Dacus. |
| 09:00:42 | 13 | MR. GORHAM:  Good morning, Your Honor.  Tom Gorham |
| 09:00:45 | 14 | on behalf of the Defendants.  And with me here this morning |
| 09:00:48 | 15 | is Mr. Ralph Phillips. |
| 09:00:50 | 16 | MR. PHILLIPS:  Good morning, Your Honor. |
| 09:00:51 | 17 | MR. GORHAM:  Mr. Dan Tishman and Brendan |
| 09:00:56 | 18 | McLaughlin.  The Defendants are ready, Your Honor. |
| 09:00:58 | 19 | THE COURT:  All right.  Thank you, Mr. Gorham. |
| 09:00:59 | 20 | We have a variety of motions, but unless counsel |
| 09:01:06 | 21 | have a better idea, we can start with the first filed, |
| 09:01:09 | 22 | which is the motion to amend the complaint. |
| 09:01:11 | 23 | And that is Plaintiff's motion, so I'll turn it |
| 09:01:14 | 24 | over to Plaintiff. |
| 09:01:17 | 25 | MR. ERWINE:  Good morning, Your Honor.  Again, my |

09:01:28   1   name is Richard Erwine on behalf of Plaintiff, SK nexilis.

09:01:32   2        And I'm here to speak about our motion to amend

09:01:36   3   the complaint to add some trade secret allegations.

09:01:39   4        And, Your Honor, I was -- what I'd like to do is

09:01:43   5   talk about the four factors to be considered for purposes

09:01:48   6   of our motion.  The first is did Plaintiff act diligently

09:01:55   7   in pursuing the motion?  And I understand, of course, that

09:01:58   8   this motion was brought very late in time in the case.  We

09:02:01   9   do have a trial date in November.  We are in the middle of

09:02:05  10   briefing on summary judgment and Daubert motions.

09:02:12  11        But, Your Honor, this was something that we only

09:02:15  12   learned about at the very end of fact discovery.  On June

09:02:18  13   13th, we deposed a witness by the name of Mr. Lee, and that

09:02:22  14   was just a few days before the end of fact discovery.

09:02:26  15        And, Your Honor, what I want to talk about first

09:02:29  16   is the fact that we took the deposition very late in

09:02:34  17   discovery, and I think that's pretty common in these cases,

09:02:36  18   and there were some -- some factors that led to us taking

09:02:39  19   that.  One of those was that the parties had agreed that

09:02:44  20   their witnesses would only be deposed once.

09:02:47  21        So the notion that we would be taking depositions

09:02:52  22   early or even in the middle of discovery, I think, is a

09:02:57  23   little bit aspirational, and I think that some of the dates

09:03:03  24   that relate to that timing of the deposition are important.

09:03:07  25        THE COURT:  Well, the most important thing I saw

09:03:09    1   in the briefs regarding the timing of the deposition was

09:03:15    2   your contention that 1,800 out of the 1,900 emails relating

09:03:20    3   to the witness were produced around the time you scheduled

09:03:27    4   the deposition.  The response to that was that the delay in

09:03:35    5   production of those was attributable to you.  That's

09:03:40    6   something I hadn't heard a response to, so tell me about

09:03:43    7   that.

09:03:43    8       MR. ERWINE:  Certainly, Your Honor.

09:03:44    9       So that related to the ESI production, and,

09:03:48   10   frankly, it was just a question of the parties negotiating

09:03:51   11   those terms, figuring out what the plan was going to be.

09:03:55   12   And that process admittedly started somewhat late in

09:03:59   13   discovery.  I think the communications started maybe in the

09:04:02   14   March/February time frame, but they were completed in

09:04:07   15   March.  And then the process kind of took the path that it

09:04:11   16   typically does, where we were coming up with search terms,

09:04:15   17   providing that information to the other side.  They were

09:04:17   18   doing the same.  And the documents were ultimately not

09:04:21   19   collected and produced until -- I believe it was May 27th

09:04:25   20   when we got the bulk of those.

09:04:27   21       But, again, I think that that timing of the ESI

09:04:33   22   production was somewhat similar to the substantial

09:04:36   23   completion of document production date.  That date was

09:04:39   24   April 1st.

09:04:40   25       So we had timed the ESI production.  Like I said,

09:04:48  1   I think the process started in February.  The hope was that

09:04:51  2   those documents would be produced a bit earlier, closer to

09:04:56  3   the substantial document completion deadline.  But the

09:05:00  4   reality is they were not.

09:05:03  5          That all said, I think that these depositions --

09:05:07  6   you know, this was a deposition that was in Korea,

09:05:10  7   translated deposition, 30(b)(6) witness, and both parties

09:05:16  8   were putting depositions toward the end of fact discovery,

09:05:20  9   which, again, I think is relatively common because there

09:05:24  10  were things like the completion of document production, the

09:05:28  11  claim construction argument, and actually the order that we

09:05:33  12  got in April.  So, you know, my experience in these cases,

09:05:39  13  these depositions tend to be later in time in terms of fact

09:05:43  14  discovery.

09:05:44  15          THE COURT:  One fact that the Defendants pointed

09:05:46  16  out that seemed to count in their favor was the fact that

09:05:53  17  this witness is a former employee of the Plaintiff, as I

09:05:59  18  understand it, the suggestion being that you should have

09:06:02  19  had some inkling that this could come up in connection with

09:06:08  20  him.

09:06:08  21          Tell me about that.  Was this misappropriation of

09:06:16  22  trade secrets something that was suspected or anticipated

09:06:20  23  before that deposition?

09:06:21  24          MR. ERWINE:  That was not something that from our

09:06:25  25  perspective as a team we had talked about.  So at least

| | | |
|---|---|---|
| 09:06:30 | 1 | from our preparations, we were somewhat surprised by what |
| 09:06:35 | 2 | we learned in that deposition. |
| 09:06:38 | 3 | So we -- from our perspective, we did not go into |
| 09:06:42 | 4 | that deposition with the understanding that there could be |
| 09:06:44 | 5 | this type of, you know, trade secret misappropriation.  I |
| 09:06:50 | 6 | think it's relatively common for employees of one of these |
| 09:06:54 | 7 | entities to go to another because there's very few of these |
| 09:06:58 | 8 | entities that exist.  So I don't think we necessarily |
| 09:07:03 | 9 | expected what we learned in that deposition. |
| 09:07:06 | 10 | THE COURT:  And tell me about how that came out, |
| 09:07:10 | 11 | what it was that you learned at the deposition that has led |
| 09:07:13 | 12 | to this -- this claim. |
| 09:07:17 | 13 | MR. ERWINE:  Certainly, Your Honor. |
| 09:07:18 | 14 | So what we learned was that this particular |
| 09:07:23 | 15 | witness had been hired to help with the production process |
| 09:07:30 | 16 | at Solus and -- Volta is the company that is located in |
| 09:07:34 | 17 | Hungary.  Solus is the company that's located in Korea. |
| 09:07:37 | 18 | So we had learned that this individual had been |
| 09:07:40 | 19 | hired in 2023 to help with their production process. ███ |
| 09:07:45 | 20 | ████████████████████████████████████████████████████ |
| 09:07:49 | 21 | ████████████████████████████████████████ |
| 09:07:57 | 22 | ███████████████████████ ██████████████████████ |
| 09:08:02 | 23 | ██████████ |
| 09:08:02 | 24 | And one of the things that this person had reached |
| 09:08:05 | 25 | out to -- █████████████████████████████████████████████ |

| | | |
|---|---|---|
| 09:08:11 | 1 | ███████████████████████████████████ |
| 09:08:15 | 2 | ████ |
| 09:08:16 | 3 | And so once we learned this, and this was part of |
| 09:08:18 | 4 | the discovery that took place after the deposition, we |
| 09:08:21 | 5 | learned that this person ████████████████████ |
| 09:08:27 | 6 | ████████████████████████ |
| 09:08:30 | 7 | ██████████████████████████ |
| 09:08:37 | 8 | ███████████████ |
| 09:08:38 | 9 | So that was one thing that this person ████████ |
| 09:08:42 | 10 | ████████████ |
| 09:08:44 | 11 | This person also ████████████████ |
| 09:08:48 | 12 | ████████████████████████████████████████ |
| 09:08:52 | 13 | ██████. And so that was the second trade secret that |
| 09:08:57 | 14 | we've included in our motion, the fact that this person |
| 09:09:01 | 15 | ████████████████████████ |
| 09:09:07 | 16 | ███████████████████████████ |
| 09:09:11 | 17 | ███████████████████████████ |
| 09:09:16 | 18 | ████ |
| 09:09:18 | 19 | So those were the trade secrets we learned -- or |
| 09:09:21 | 20 | that we discovered had been misappropriated. And it was |
| 09:09:26 | 21 | not just this person. There were others at Defendants' who |
| 09:09:31 | 22 | had previously worked for SKn. And so it was a combination |
| 09:09:34 | 23 | of that knowledge along with this critical reach-out to |
| 09:09:39 | 24 | ████████████████. |
| 09:09:42 | 25 | THE COURT: Was that knowledge about ████████████ |

09:09:45   1   ▉▉▉▉▉▉▉▉▉▉▉▉▉ something that you knew this witness

09:09:48   2   had from his prior employment with the Plaintiff?

09:09:52   3           MR. ERWINE:  I don't know the answer to that.  I

09:09:58   4   didn't take the deposition, so I don't know if that was

09:10:00   5   something that the client was aware of at the time.  I

09:10:04   6   guess what we didn't know was that ▉▉▉▉▉▉▉▉▉▉▉▉▉

09:10:09   7   ▉▉▉▉▉▉▉▉▉▉ and acquired that information.

09:10:12   8           And let me add, Your Honor, that that ▉▉▉▉▉▉

09:10:15   9   ▉▉▉▉▉▉▉, we had not received those documents.

09:10:20   10   There was communications between the Defendant and that

09:10:25   11   witness ▉▉▉▉▉▉▉▉▉, and those documents were not

09:10:28   12   produced until after the close of fact discovery and after

09:10:31   13   that deposition.  They were produced, I believe, on July

09:10:34   14   8th.

09:10:34   15           So that was -- that goes to the next piece of the

09:10:37   16   equation, from our perspective, and that was the timing for

09:10:41   17   purposes of the deposition as opposed to when we actually

09:10:44   18   filed the motion and provided the draft complaint to the

09:10:50   19   Defendants.

09:10:51   20           THE COURT:  All right.

09:10:55   21           MR. ERWINE:  And so let me talk just a little bit

09:10:57   22   about that, Your Honor.  That deposition, as I said, took

09:11:01   23   place on June 13th.  We then sent a letter -- after we had

09:11:05   24   an opportunity to explore, we learned in the deposition, we

09:11:09   25   sent a letter to the other side explaining what we thought

09:11:12   1    were the issues and asking for a meet and confer.  That was

09:11:15   2    on June 23rd.

09:11:16   3        The meet and confer took place on July 2nd.  As I

09:11:19   4    said, those documents were produced on July 8th.  We then

09:11:23   5    provided a draft complaint to the other side on July 22nd.

09:11:28   6    They let us know on the 28th that they would oppose the

09:11:32   7    motion.  And, Your Honor, we filed the motion on July 29th.

09:11:36   8        So that is the timing of the -- the motion.

09:11:41   9        And, you know, one thing I want to point out, Your

09:11:44  10    Honor, is that there was a comment in the Defendants'

09:11:50  11    opposition that there was some kind of intentional delay,

09:11:52  12    and I just want to address that.  I think that's very far

09:11:55  13    from the truth.

09:11:57  14        I think as Your Honor is aware, we were in the

09:11:59  15    middle of expert discovery, preparing expert reports,

09:12:04  16    getting ready for expert depositions.  We had just finished

09:12:07  17    the end of fact discovery.  This was an unexpected

09:12:12  18    transaction from our perspective.  So the idea that we did

09:12:16  19    this intentionally or we delayed it, you know, I don't

09:12:20  20    think that could be further from the truth.

09:12:23  21       THE COURT:  I can tell you that if the Court

09:12:31  22    grants this motion to amend, it is very likely that I would

09:12:41  23    order that the amended or the newly added claims be

09:12:47  24    severed.  And you mentioned in your motion a belief that it

09:12:56  25    made sense to -- or was efficient to try these new claims,

09:13:02    1    the trade secret claims, with the patent claims.

09:13:07    2        It has been my experience that the opposite is

09:13:10    3    true.  So if you want to maintain that, I would like to

09:13:17    4    hear about what the efficiency you would perceive in

09:13:23    5    handling both sets of claims together would be.

09:13:28    6        MR. ERWINE:  Thank you, Your Honor.  I'm happy to

09:13:30    7    address that.

09:13:30    8        I actually think it would be more efficient to

09:13:35    9    have it be a part of this case than to sever and have it --

09:13:40   10    have it be separate.  And let me explain why.

09:13:43   11        There's a relationship between these trade secrets

09:13:48   12    and the patent infringement allegations.  The patents

09:13:51   13    themselves are directed to the physical properties of

09:13:56   14    battery copper foils.  But within those patents, there's

09:14:02   15    discussion about how those products are manufactured.  It

09:14:04   16    doesn't, of course, get into the detail of the trade

09:14:08   17    secrets because it's a trade secret.  It would not be in

09:14:11   18    the -- in the patent specification.

09:14:13   19        But there's a relationship there in terms of how

09:14:17   20    those products are manufactured and then the resulting

09:14:22   21    products that have the physical properties that we're

09:14:27   22    seeing and that are within the claims of the patents.

09:14:29   23        So from the jury's perspective, that's information

09:14:36   24    that will be helpful for them to understand what I consider

09:14:39   25    to be the whole story.  How these products are manufactured

09:14:43    1    is going to be very important for the jury to understand in

09:14:46    2    terms of reaching those properties that are set forth in

09:14:49    3    the claims.

09:14:50    4         THE COURT:  And how would it contribute to the

09:14:52    5    jury's understanding to have evidence that the processes

09:15:02    6    were acquired illegally?

09:15:05    7         MR. ERWINE:  That's a great question.

09:15:09    8         I think that the answer is that what those trade

09:15:15    9    secrets did was they allowed for the Defendants to more

09:15:21    10   efficiently create their products.  There's a -- there's a

09:15:24    11   factual dispute about whether the trade secrets were used

09:15:28    12   within the accused products, and we believe they are.

09:15:33    13        So the Defendants have said that the products were

09:15:37    14   developed in 2020.  They came from a technology agreement

09:15:42    15   with this company, CFL.  So according to Defendants, those

09:15:47    16   have been in place since before the trade secret

09:15:52    17   misappropriation.

09:15:52    18        From our perspective, the products ramped up in

09:15:56    19   the 2023/2024 time period, and we believe there is a

09:16:02    20   connection between the misappropriation of trade secrets

09:16:07    21   and the accused products.  And there are also products that

09:16:11    22   Defendants are just starting to sell, ████████████,

09:16:17    23   and we believe those are also accused products and part of

09:16:23    24   what we believe is a trade secret misappropriation.

09:16:25    25        So from the perspective of the jury, we believe

09:16:28    1    that this understanding of how the products are

09:16:32    2    manufactured is going to give them background for how

09:16:36    3    Defendants were able to not only meet the material

09:16:40    4    properties that are set forth in the claims but bring them

09:16:43    5    to scale for their primary customer here in Texas, ████.

09:16:48    6         THE COURT:  And how does your claim that they came

09:16:55    7    by this information improperly, how does that fit into what

09:17:02    8    you've just described?

09:17:04    9         MR. ERWINE:  I think it fits in in terms of what

09:17:07    10   we consider to be a collection of bad acts by the -- by the

09:17:11    11   Defendant.

09:17:11    12        THE COURT:  Absolutely.  And that's why, in my

09:17:18    13   opinion, it's just improper to throw this in just to have

09:17:25    14   the Defendant wear the black hat during the patent

09:17:29    15   infringement trial.

09:17:30    16        MR. ERWINE:  Well, Your Honor, I think there's a

09:17:33    17   couple of other places where we're going to see it anyway

09:17:36    18   in the patent case.  We've argued for willful infringement

09:17:40    19   and copying.  We've made these allegations as part of that

09:17:45    20   piece of the patent infringement case.

09:17:48    21        So we plan to bring it into the case already.  And

09:17:55    22   having the opportunity to explore that further we believe

09:18:00    23   would be not only beneficial for the jury's understanding

09:18:02    24   but more efficient, frankly, Your Honor, for both parties.

09:18:06    25   From our perspective, two trials in two cases and having to

| | | |
|---|---|---|
| 09:18:10 | 1 | go through this process versus combining it and the |
| 09:18:17 | 2 | efficiencies for the parties, for the Court, and, you know, |
| 09:18:20 | 3 | from that perspective, I know the other side said that |
| 09:18:23 | 4 | eight months was the amount of time.  We certainly don't |
| 09:18:26 | 5 | believe that that amount of time is necessary.  We think it |
| 09:18:29 | 6 | can be done in a much shorter time period. |
| 09:18:42 | 7 | THE COURT:  All right.  Thank you, Mr. Erwine. |
| 09:18:56 | 8 | MR. ERWINE:  All right.  Thank you, Your Honor. |
| 09:18:58 | 9 | MR. PHILLIPS:  Good morning, Your Honor.  Ralph |
| 09:19:16 | 10 | Phillips, Fish & Richardson, on behalf of Defendants. |
| 09:19:18 | 11 | Your Honor, I have a few slides.  I'm not sure how |
| 09:19:20 | 12 | many I'm going to use, but may I approach to provide them? |
| 09:19:23 | 13 | THE COURT:  Yes. |
| 09:19:24 | 14 | MR. PHILLIPS:  All right.  Your Honor, may I |
| 09:19:53 | 15 | proceed? |
| 09:19:54 | 16 | THE COURT:  Yes. |
| 09:19:55 | 17 | MR. PHILLIPS:  All right.  Thank you. |
| 09:19:56 | 18 | Your Honor, I'd like to sort of touch on the |
| 09:20:02 | 19 | four -- I believe -- I think this may be the wrong slide. |
| 09:20:06 | 20 | Sorry. |
| 09:20:10 | 21 | While he's getting the slides keyed up, I wanted |
| 09:20:14 | 22 | to touch on the four considerations that should be on the |
| 09:20:18 | 23 | table for this motion. |
| 09:20:21 | 24 | As supported by the Fifth Circuit, again, we've |
| 09:20:24 | 25 | got what the explanation is for the failure to timely |

09:20:28    1    comply.  In other words, was the movant diligent?  Two,

09:20:33    2    what's the importance of the modification?  For example, if

09:20:34    3    it's a frivolous claim, that wouldn't be very important.

09:20:38    4    And the last two kind of go together.  What's the

09:20:40    5    prejudice, and can a continuance cure it?  Your Honor, here

09:20:42    6    we believe the answer to all of these is no and that all

09:20:46    7    factors weigh against Plaintiff such that the motion should

09:20:50    8    be denied.

09:20:50    9        Let's talk a little bit about SKn's inability to

09:20:56    10    show diligence here.  As has already been discussed, there

09:21:00    11    was a substantial delay in taking Dr. Lee's deposition in

09:21:04    12    this case.  This timeline here on Slide 4 lays it out.  It

09:21:09    13    shows from the inception of the case back in May of last

09:21:12    14    year through to close of fact discovery in June of this

09:21:17    15    year, and as you can see, right out of the gate in June of

09:21:20    16    last year, Volta sent disclosures that identified Dr. Lee,

09:21:25    17    and we also served a notice at that time.

09:21:27    18        There was an additional production of some of his

09:21:32    19    documents in August.  Nonetheless, though -- and we'll get

09:21:35    20    to this in the next slide -- but I did want to -- did want

09:21:38    21    to also highlight -- as you can see at the bottom of the

09:21:41    22    screen, we have this February of 2025 date to amend

09:21:47    23    pleadings.

09:21:48    24        Nonetheless, counsel for SKn elected to delay

09:21:54    25    depositions until 2025.  And as you can see, they didn't

09:21:56  1  actually even notice Dr. Lee's deposition until April.

09:21:59  2  Despite being offered dates in May, did not take the

09:22:03  3  deposition until June.

09:22:05  4       Now, as you just heard, there's been some pushback

09:22:09  5  in that this is somehow our fault for delaying the ESI

09:22:13  6  discovery.  That's just not the case here, Your Honor.

09:22:15  7  Things kicked off in January when counsel for Defendants

09:22:18  8  actually proposed we should probably meet and confer about

09:22:21  9  ESI.  There was some delay around that which actually

09:22:24  10 pushed us beyond the day to amend pleadings by Plaintiff,

09:22:29  11 and ultimately agreed in March -- March 11th to meet and

09:22:32  12 confer on the issue.

09:22:36  13      Then, Your Honor, there was obviously negotiations

09:22:40  14 about the order itself.  It was entered on the 28th of

09:22:43  15 March.  And then Defendants didn't actually get the ESI

09:22:48  16 request until April 15th.

09:22:50  17      Now, as I'm sure Your Honor is aware, these

09:22:53  18 requests are search terms.  They need to be run against

09:22:56  19 thousands of emails.  So there's always a negotiation that

09:22:59  20 follows that to try to get the hit counts down.  So that --

09:23:02  21 you know, that process occurred resulting in the actual

09:23:04  22 production in May.

09:23:05  23      So couple of things, you know, on this.  This

09:23:14  24 delay obviously is in large part due to SKn's counsel's

09:23:19  25 delay in getting back to us, first in the meet and confer

09:23:22    1    and then, you know, with the requests themselves.

09:23:26    2         But, you know, one thing to note is during this

09:23:28    3    time -- you know, before any of this production, Defendants

09:23:32    4    did begin taking depositions of witnesses on the other

09:23:37    5    side.  We did not wait -- apologies -- we didn't wait this

09:23:42    6    long, you know, until the close of -- or the completion of

09:23:45    7    this ESI process to begin taking depositions.

09:23:48    8         So, again, Your Honor, the ESI issue is really,

09:23:59    9    again, just another discovery delay that should be properly

09:24:04    10    laid at the feet of SKn.

09:24:04    11         As we cite in our briefing, these types of

09:24:10    12    self-imposed delays are frequently relied upon in denying

09:24:15    13    these types of motions, including the Squires case.  But

09:24:21    14    there's also additional delay, and that's the delay that

09:24:25    15    occurred after Dr. Lee's deposition in bringing this

09:24:27    16    motion.

09:24:27    17         This slide lays that out.  We're on Slide 10 now.

09:24:31    18         Again, Dr. Lee's depo took place on June 13th --

09:24:35    19         THE COURT:  Well, the part of this history that

09:24:37    20    resonated with me in terms of why there was delay was that

09:24:46    21    you designated that deposition as attorneys' eyes only.

09:24:50    22         MR. PHILLIPS:  That -- that is what has been

09:24:53    23    stated in SKn's reply, and true, that it was designated.

09:24:57    24    But here, Your Honor, if you'll notice, it's the second

09:25:00    25    dotted line down.  There was nearly three weeks between

09:25:04    1    June 13th, when the deposition took place, and when SKn met

09:25:10    2    and conferred with us about the issue of how did they do a

09:25:16    3    Rule 11 investigation in light of that designation?  So if

09:25:17    4    this was the big problem that they say it was, why were we

09:25:18    5    not talking about that the week of June 13th?

09:25:21    6         So, again, Your Honor, I think the delays here,

09:25:24    7    including the delay that it took because of the

09:25:27    8    restriction, are all properly laid at SKn's feet.

09:25:33    9         THE COURT:  Do you have some reason to believe

09:25:35   10    that the Plaintiff was aware of what the witness ended up

09:25:44   11    disclosing at his deposition before they heard it at the

09:25:48   12    deposition?

09:25:51   13         MR. PHILLIPS:  Well, again, not the entirety of

09:25:53   14    what was in the deposition.  But certainly, again, he was a

09:25:57   15    prior employee.  There was -- and he had been designated

09:25:59   16    more than a year prior as someone of knowledge.  So I guess

09:26:03   17    they certainly had knowledge to know that this was an

09:26:05   18    individual that they should be getting discovery from.

09:26:09   19    And, you know, frankly, Your Honor, had they done that

09:26:11   20    earlier, all of the things that we're seeing, all of these

09:26:14   21    timelines would have been shifted earlier in time.

09:26:17   22         It's often the case -- in fact, I'd say in my

09:26:20   23    experience, more often than not, that there is additional

09:26:23   24    production, either just before and/or just after a

09:26:26   25    deposition as new issues come up that people haven't

```
09:26:29    1    anticipated, you know, and it's uncovered that there's new,

09:26:33    2    you know, additional documents that could be relevant.

09:26:35    3          So just for that consideration alone, you know,

09:26:38    4    prudence is -- dictates that -- you know, advises that we

09:26:42    5    should be doing these depositions earlier.  This deposition

09:26:44    6    should have happened earlier, Your Honor.

09:26:46    7          THE COURT:  Amen to that.  But it's very typical

09:26:49    8    that the depositions aren't taken until the documentary

09:26:57    9    discovery has been exchanged and all of the witnesses'

09:27:02    10   emails have been discovered.  So I'm not surprised by that.

09:27:05    11   But I think it's not optimal.

09:27:08    12         But was your side aware of the witness's ███████

09:27:16    13   ███████████, I think it was, to obtain information about

09:27:22    14   ████████████████████████████████████████████████████████████

09:27:28    15   ████████████████████?

09:27:29    16         MR. PHILLIPS:  No, Your Honor, that's something

09:27:31    17   that came up in the deposition.  And actually I'm glad you

09:27:35    18   brought that up because if I back up to this slide showing

09:27:39    19   the production on May 27th, there was mention of in the

09:27:44    20   briefing and here today another email production that

09:27:46    21   occurred after the deposition.  That was a function of the

09:27:49    22   fact that, you know, the original search terms that we got

09:27:52    23   didn't capture a lot of the -- it didn't capture the

09:27:56    24   outreach and things you're talking about that came up in

09:27:58    25   the deposition -- a lot of it came up in the deposition.
```

09:28:01  1  We had to do additional searches which we willingly did and

09:28:06  2  provide them to SKn.  So short answer is no.

09:28:08  3      THE COURT:  Well, if it was a surprise to your

09:28:15  4  side, that would certainly indicate that it would be a

09:28:17  5  surprise to the Plaintiff.

09:28:20  6      MR. PHILLIPS:  Absolutely correct, Your Honor.

09:28:22  7  But, again, had we moved quicker on ESI, instead of 5/27,

09:28:29  8  we might have been looking at March 27 or February 27.  So,

09:28:35  9  again, Your Honor, a failure to engage on ESI was a big

09:28:39  10  part of how we got here.

09:28:41  11      THE COURT:  Well, we've still got some issues to

09:28:45  12  go over about whether the claims would be futile, as you

09:28:49  13  briefed.

09:28:50  14      But while we're on this timeline issue, if the

09:28:52  15  Court is going to allow the trade secrets claims to be

09:28:55  16  added, what is your position about whether it would be more

09:29:01  17  efficient to try them jointly with the infringement case?

09:29:06  18      MR. PHILLIPS:  Without question, again, we

09:29:12  19  strongly request the Court not to grant, but if it were to

09:29:17  20  grant, we would absolutely ask that it be severed into a

09:29:20  21  separate action for all the reasons Your Honor has already

09:29:24  22  mentioned.  You know, first and foremost, by definition, a

09:29:28  23  trade secret case is about secrets.  A patent case is about

09:29:32  24  public -- publicly available patent claims.

09:29:36  25      So I hope for their sake they are going to end up

09:29:39   1   identifying very different things for the trade secrets

09:29:42   2   relative to what's in the patent case, or otherwise they

09:29:45   3   just don't have trade secrets, Your Honor.  So the idea

09:29:47   4   that there's some sort of massive efficiency to be had

09:29:50   5   here, it's just not the case as a legal matter.

09:29:52   6        But beyond that, you know, again, as Your Honor

09:29:57   7   indicated, it really is I think a naked attempt to just

09:30:01   8   sort of drag some unpleasantries in front of the jury in

09:30:10   9   the patent case that just don't belong there.  So as a

09:30:12  10   matter of fairness, as well, it doesn't make sense.

09:30:14  11        And, lastly, Your Honor, I would add -- I mean,

09:30:15  12   this is already a pretty complicated case.  We've still got

09:30:19  13   five asserted patents, 23 asserted claims, five experts.

09:30:23  14   We've had, like, 30 depos taking place all over the world.

09:30:27  15   Presumably all of that stuff is going to get chopped up and

09:30:30  16   put into a five-day trial already.

09:30:30  17        The idea that we're going to do a whole other

09:30:33  18   independent cause of action in that same time frame, you

09:30:36  19   know, we've -- we've already got 15 pounds of mulch we're

09:30:40  20   trying to get into a five-pound bag, and now we're trying

09:30:44  21   to shovel more in.  It just doesn't make sense.

09:30:50  22        THE COURT:  All right.  Talk to me about your

09:30:52  23   position that they can't state a claim under DTSA, and I

09:30:56  24   read your arguments that it requires that there be some act

09:31:00  25   in furtherance in the U.S.

09:31:04  1      They point to their claim that the sales resulting

09:31:07  2  from these trade secrets happening in the U.S. would

09:31:13  3  qualify as an act in furtherance under DTSA.  What is your

09:31:20  4  response to that?

09:31:20  5      MR. PHILLIPS:  So there's a couple of problems

09:31:24  6  with the pleading.  First of all, the -- the way in which

09:31:28  7  it's pled is very vague.  You know, how these trade secrets

09:31:32  8  are actually -- how and if these trade secrets are actually

09:31:35  9  being used in the accused products at issue in this case.

09:31:40  10      THE COURT:  That's almost always vague in a trade

09:31:42  11  secrets case.  So I'm -- that part, it doesn't appeal to me

09:31:47  12  that much.

09:31:47  13      MR. PHILLIPS:  Right, Your Honor.

09:31:49  14      But here, they're so vague that we think they --

09:31:54  15  you know, we submit they don't rise to more than a

09:31:56  16  speculative level, which is an issue in light of precedent

09:32:01  17  like Twombly.

09:32:01  18      The other problem we've got here, Your Honor, is

09:32:03  19  that, again, even assuming they're sufficiently fleshed out

09:32:08  20  to make that claim, they're inconsistent with the record

09:32:12  21  that we now know.  I mean, Dr. Lee was unambiguous about

09:32:15  22  the fact that, okay, ███████████████     ███████████████████

09:32:18  23  ████████████████     ████████████████████████

09:32:21  24  ████████████████████████████████████████████████

09:32:23  25  ████████████     ████████████████████████

09:32:26  1    So there's just a disconnect between, you know,

09:32:28  2  this whole misadventure that we're being invited to go on,

09:32:33  3  and the facts, particularly of the patent case, which are

09:32:35  4  about accused products that are in no way tethered to

09:32:37  5  these, you know, alleged trade secrets.

09:32:42  6    You know, frankly, Your Honor, we submit that if

09:32:44  7  separately brought, this would not survive a motion to

09:32:47  8  dismiss.  It's frivolous, and it should not be added to

09:32:50  9  this case.

09:32:50  10    The other thing I'd note, too, is, you know, the

09:33:00  11  DTSA is clear that it requires an act in furtherance of the

09:33:03  12  offense to be committed in the United States.  The way in

09:33:11  13  which SKn is interpreting this effectively reads this out

09:33:13  14  of the statute.  I mean, it doesn't require -- you know,

09:33:17  15  the simple -- the idea that just a simple sale in the

09:33:19  16  United States of trade secrets that were acquired extra --

09:33:25  17  you know, extraterritorially -- abroad, let's just say,

09:33:29  18  from foreign actors, foreign corporations, and, you know,

09:33:33  19  being manufactured outside of the United States, that

09:33:37  20  strips everything out -- all the things that actually

09:33:39  21  involve the misappropriation and use of the trade secret

09:33:42  22  outside the United States.

09:33:44  23    So all that's left is the gizmo is coming in, and

09:33:48  24  it's being sold.  And, Your Honor, I think actually there's

09:33:52  25  language in one of the cases that Plaintiff relies on, the

| | |
|---|---|
| 09:33:56 | 1 |
| 09:33:59 | 2 |
| 09:34:01 | 3 |
| 09:34:04 | 4 |
| 09:34:05 | 5 |
| 09:34:06 | 6 |
| 09:34:09 | 7 |
| 09:34:11 | 8 |
| 09:34:16 | 9 |
| 09:34:20 | 10 |
| 09:34:27 | 11 |
| 09:34:31 | 12 |
| 09:34:35 | 13 |
| 09:34:39 | 14 |
| 09:34:41 | 15 |
| 09:34:44 | 16 |
| 09:34:47 | 17 |
| 09:34:50 | 18 |
| 09:34:55 | 19 |
| 09:34:58 | 20 |
| 09:35:00 | 21 |
| 09:35:02 | 22 |
| 09:35:05 | 23 |
| 09:35:09 | 24 |
| 09:35:12 | 25 |

1  Luminati case, that's actually instructive here.  It

2  states:  Though damages caused as a result of

3  misappropriation do not constitute part of the offense

4  itself.

5       And that's exactly what we have here.

6       These, again, in -- both because of the factual

7  reality here, but also because of the way it's pled,

8  there's -- there's no tethering of these alleged acts of

9  misappropriation to the United States, let alone Texas.

10       THE COURT:  Do you know whether in the Luminati

11  case the damages that the Court was saying would not be

12  sufficient were sales of the alledgedly -- the goods

13  allegedly produced through the trade secrets?

14       MR. PHILLIPS:  Your Honor, in Luminati, the Court

15  actually ends up granting the motion but not on the ground

16  that you just stated, not on sales alone.

17       There, there was specific allegations that the

18  trade secrets were used to commit acts of misappropriation

19  in the state of Texas and the United States.  That's same

20  page, Page 3, within -- within the decision.

21       So, again, Your Honor, we think it's not just a

22  distinguishable case, it's an instructive case as to why

23  you have to have more.  I mean, for that -- for Section 2

24  of the DTSA to mean anything, it's got to be more than,

25  yeah, they were selling -- they were selling it down the

09:35:14  1    street.

09:35:17  2         THE COURT:  And is there any other case law that

09:35:20  3    you can point to that you think is instructive on what

09:35:27  4    would count as an act in furtherance?

09:35:29  5         MR. PHILLIPS:  One second, Your Honor.  Apologies,

09:35:49  6    Your Honor, I've got too many pages in front of me.

09:35:57  7         If we go to Slide 16 here, I see, Your Honor, we

09:36:00  8    cite several cases that we think are instructive on this.

09:36:06  9    For example, this last one, the ProV case, there, there was

09:36:11  10   a dismissal of the DTSA claim because the amended complaint

09:36:14  11   contains no allegation suggesting the Defendants attempted

09:36:17  12   to recruit an employee from the United States, there's one

09:36:20  13   example; that Defendants acquired in the United States

09:36:23  14   Defendants' trade secrets, there's another one; or that

09:36:27  15   Defendants used trade secrets in the United States.  So

09:36:30  16   right there there's three examples of what it would take to

09:36:33  17   make a DTSA claim.  And we don't have any of those here,

09:36:38  18   Your Honor.

09:36:38  19        I'd also note -- you know, going back to what we

09:36:41  20   talked about earlier on specificity.  In the Sysco

09:36:51  21   Machinery case, they say:  We insist on some specificity

09:36:51  22   when a Plaintiff pleads trade secret misappropriation

09:36:52  23   because of the type of the claim and its potential to

09:36:52  24   seriously disrupt ordinary business relationships.

09:36:55  25        So, again, we do think there's an issue both with

09:36:59   1   the sufficiency of the pleading as well as what's -- if you

09:37:03   2   infer heavily what's actually pled.

09:37:10   3           THE COURT:  All right.

09:37:24   4           MR. PHILLIPS:  All right.  Your Honor, I think --

09:37:26   5   unless you have any other questions, with that, I'm going

09:37:28   6   to turn things back over to counsel for SKn.

09:37:31   7           THE COURT:  All right.  Thank you, Mr. Phillips.

09:37:33   8           MR. PHILLIPS:  Thank you, Your Honor.

09:37:34   9           MR. ERWINE:  Your Honor, if we could go back to

09:37:44  10   Defendants' Slide 16.

09:37:45  11           And I think -- I don't think that counsel did this

09:38:01  12   on purpose, but the -- the last -- in the ProV case, it's

09:38:08  13   not an "and," it's an "or," or the Defendants used the

09:38:13  14   trade secrets in the United States.  And it's certainly our

09:38:15  15   position that that's exactly what happened, Your Honor.

09:38:16  16           And you asked for another case, and I wanted to

09:38:18  17   give another case to you.  It's the Motorola Solutions

09:38:24  18   versus Hytera Communications.  That's a Seventh Circuit

09:38:27  19   case, 108 F.4th 458.  And in that case, Your Honor, the

09:38:34  20   Court found that that Motorola -- Motorola's actions of

09:38:42  21   advertising the accused products in the U.S. was enough to

09:38:46  22   satisfy that use.

09:38:47  23           And I actually think some of the language from the

09:38:50  24   Motorola case is instructive.  If you bear with me, I'd

09:38:54  25   like to read it into the record -- read it for you because

| | | |
|---|---|---|
| 09:38:57 | 1 | I think it's helpful. |
| 09:38:58 | 2 | That case says:  Use is any exploitation of the |
| 09:39:01 | 3 | trade secret that is likely to result in injury to the |
| 09:39:04 | 4 | trade secret owner or enrichment to the Defendant, |
| 09:39:07 | 5 | including marketing goods that embody the trade secret, |
| 09:39:11 | 6 | employing the trade secret in manufacture or production, |
| 09:39:15 | 7 | relying on the trade secret to assist or accelerate |
| 09:39:18 | 8 | research or development, or soliciting customers through |
| 09:39:20 | 9 | the use of information that is a trade secret. |
| 09:39:23 | 10 | So, again, Your Honor, we think that case is |
| 09:39:26 | 11 | instructive. |
| 09:39:28 | 12 | THE COURT:  And the Court would be, at least in |
| 09:39:31 | 13 | our situation, discussing doing those things in the U.S. |
| 09:39:37 | 14 | MR. ERWINE:  Correct. |
| 09:39:37 | 15 | THE COURT:  And so you're saying that marketing |
| 09:39:39 | 16 | would be comparable to sales? |
| 09:39:41 | 17 | MR. ERWINE:  Exactly, Your Honor.  Exactly right. |
| 09:39:43 | 18 | That's exactly the analogy. |
| 09:39:46 | 19 | THE COURT:  All right.  I'll look at that Motorola |
| 09:39:49 | 20 | case.  I see it cited in your reply brief. |
| 09:39:53 | 21 | MR. ERWINE:  And, Your Honor, the last thing I |
| 09:39:55 | 22 | want to say was just back to how do we make sense of this |
| 09:40:01 | 23 | case or this -- adding these trade secret misappropriation |
| 09:40:07 | 24 | allegations to this case.  And as we said in our papers, I |
| 09:40:11 | 25 | think that it can be done in a relatively short period of |

| | | |
|---|---|---|
| 09:40:14 | 1 | time.  And we do believe there's enough of a nexus -- the |
| 09:40:20 | 2 | notion that these are distinct issues, we believe there's |
| 09:40:25 | 3 | an overlap in documents and witnesses.  Dr. Lee, of course, |
| 09:40:29 | 4 | is one of their 30(b)(6) witnesses for the patent |
| 09:40:32 | 5 | infringement allegations.  He's going to be a primary |
| 09:40:37 | 6 | witness for the trade secret allegations. |
| 09:40:38 | 7 | So from an efficiency perspective, we believe it |
| 09:40:41 | 8 | makes sense to do it as part of one case, just in part |
| 09:40:45 | 9 | because of the overlap of facts, documents, and witnesses. |
| 09:40:49 | 10 | THE COURT:  I can tell you that my experience has |
| 09:40:57 | 11 | been completely to the contrary.  And to the extent I'm |
| 09:41:02 | 12 | considering granting your motion, it is based on the belief |
| 09:41:11 | 13 | that I will also sever it. |
| 09:41:13 | 14 | So if what you're after is to have these claims |
| 09:41:16 | 15 | all tried together, then we might as well not grant the |
| 09:41:21 | 16 | motion because that's the one thing that won't happen is |
| 09:41:25 | 17 | that we're going to grant it, delay this case -- the |
| 09:41:31 | 18 | infringement case for a number of months, and then try all |
| 09:41:34 | 19 | these claims together. |
| 09:41:40 | 20 | In fact, one reason I don't do that is because I |
| 09:41:43 | 21 | think that there is often an incentive to put into a patent |
| 09:41:49 | 22 | infringement case something that allows one side or the |
| 09:41:54 | 23 | other to be tarred with an act that the jury would assume |
| 09:42:03 | 24 | is wrongful.  And patent infringement is not that sexy. |
| 09:42:14 | 25 | Trade theft or all kinds of other misappropriation claims |

09:42:20    1    have a lot more jury appeal.  And so in order to minimize

09:42:27    2    that incentive, I'll try and sever out counterclaims or

09:42:36    3    trade secret.

09:42:36    4         Now, if all this had been filed together, you

09:42:40    5    would have perhaps a closer question.  But given the fact

09:42:45    6    that in order to keep these together, we would have to

09:42:50    7    delay a patent infringement trial that is virtually ready

09:42:57    8    to go, I'll just tell you that that's just not going to

09:43:02    9    happen.

09:43:03    10         So if that affects your feelings about the

09:43:13    11   amendments, you need to know that.

09:43:15    12         MR. ERWINE:  Thank you, Your Honor.  My colleague,

09:43:17    13   Mr. Dacus, is going to address that.

09:43:18    14         THE COURT:  All right.  I'll let -- Mr. Dacus is

09:43:20    15   well familiar with my predilections in that regard, so...

09:43:24    16         MR. DACUS:  I am, Your Honor.

09:43:25    17         The only thing I would -- I understand what the

09:43:27    18   Court has said, but I do want to point out for the Court

09:43:30    19   that we have tried cases -- patent cases with both

09:43:37    20   antitrust allegations, trade secret allegations, and other

09:43:43    21   state law tort allegations.  The two that come to my mind

09:43:47    22   that I was involved with are the ATL case that

09:43:54    23   Judge Gilstrap tried that had antitrust allegations.

09:43:55    24         And then we tried a case called Vicor versus

09:44:00    25   SynQor in front of Judge Schroeder here in Marshall two or

09:44:05  1  three years ago that -- very similar circumstances to these

09:44:09  2  that involve patent claims and trade secret and other state

09:44:09  3  law tort action.

09:44:11  4      So I only say that to say to the Court I don't

09:44:14  5  think it's unprecedented that we would try these things

09:44:18  6  together.  I think there are some efficiencies.  I

09:44:22  7  understand the Court saying that there are other factors at

09:44:24  8  issue here, the lateness of the case, so I'm not attempting

09:44:27  9  to argue with the Court in that regard.  I just want to

09:44:30  10  make sure that the Court is reminded that we have tried

09:44:34  11  these cases together in certain circumstances.

09:44:36  12      THE COURT:  I understand that.  And if these

09:44:38  13  claims had been in the case from the start, we'd be having

09:44:41  14  a different conversation.  But we would still be talking

09:44:45  15  about whether they should all be tried together.

09:44:50  16      In the antitrust area, I think that it's a little

09:44:54  17  different, too, than a theft of trade secrets claim, but --

09:45:02  18      MR. DACUS:  Understood.

09:45:03  19      THE COURT:  -- I am not doubting that it is

09:45:05  20  possible to try them together.

09:45:06  21      MR. DACUS:  Yes.  And then to be clear, Your

09:45:08  22  Honor, we do ask that the Court grant the amendments,

09:45:11  23  whether severed or not, so that we're clear in that

09:45:15  24  request.

09:45:15  25      Thank you, Your Honor.

09:45:15  1        THE COURT:  All right.  I appreciate that,

09:45:17  2  Mr. Dacus.

09:45:20  3        And I do want to hear from the Plaintiff on the

09:45:26  4  specific allegations of the amended complaint that respond

09:45:35  5  to the objections that you haven't articulated

09:45:40  6  sufficiently, acts in furtherance in the U.S.  If you can

09:45:48  7  direct me to those, that would be helpful.

09:45:51  8        MR. ERWINE:  Your Honor, I'd have to go back and

09:45:53  9  look at our exact language to give that to you.  I can do

09:45:56  10  that, I just -- I don't have it at my fingertips.  But I

09:46:01  11  can certainly say that our allegations are connected to the

09:46:08  12  sales in the U.S., and our -- that's part of our amended

09:46:11  13  complaint as we -- as we mentioned.  So -- and I can point

09:46:14  14  out the specific paragraphs.  I would just have to confer.

09:46:18  15        THE COURT:  Take a look at your complaint, and

09:46:20  16  I'll be pulling it up, as well.

09:46:22  17        MR. ERWINE:  Okay.  Thank you for your, patience,

09:50:16  18  Your Honor.

09:50:16  19        I conferred with my colleagues, and the paragraphs

09:50:21  20  that we believe set forth the information that would meet

09:50:24  21  that is Paragraphs 13 and 14, Paragraph 63, 66, 73, 161 --

09:50:34  22        THE COURT:  Hold on.

09:50:38  23        MR. ERWINE:  Sorry.

09:50:40  24        THE COURT:  All right.  13 and 14.

09:50:41  25        MR. ERWINE:  13 and 14.

| | | |
|---|---|---|
| 09:50:43 | 1 | THE COURT:  63. |
| 09:50:44 | 2 | MR. ERWINE:  63, 66, 73, 161, and 172. |
| 09:51:00 | 3 | THE COURT:  Well, that's helpful because the only |
| 09:51:02 | 4 | one I located initially was 48, which didn't even come up. |
| 09:51:23 | 5 | So let's talk about what those paragraphs allege. |
| 09:51:30 | 6 | MR. ERWINE:  And I will say, Your Honor, looking |
| 09:51:34 | 7 | at Paragraph 48, too, I think that also should be included, |
| 09:51:39 | 8 | and I would probably say that entire -- I would probably |
| 09:51:52 | 9 | start at 44 as background up through 48. |
| 09:51:58 | 10 | THE COURT:  So the accused products that are |
| 09:52:00 | 11 | referred to in these various paragraphs are -- you're not |
| 09:52:05 | 12 | just talking about products that you contend infringe? |
| 09:52:11 | 13 | This is products that you contend result from this |
| 09:52:17 | 14 | misappropriation? |
| 09:52:19 | 15 | MR. ERWINE:  So the products that -- at this stage |
| 09:52:23 | 16 | that we're aware of that bear relationship are the -- I |
| 09:52:30 | 17 | believe it's ██████████████. |
| 09:52:37 | 18 | THE COURT:  And so is it the same products -- is |
| 09:52:41 | 19 | your amended complaint focused on the same products as your |
| 09:52:49 | 20 | infringement case? |
| 09:52:50 | 21 | MR. ERWINE:  It is, Your Honor.  And our amended |
| 09:52:55 | 22 | complaint in terms of patent infringement also refers to |
| 09:52:58 | 23 | ████████████████.  And that's a newer product, which, in |
| 09:53:04 | 24 | fact, the Defendants have just given us some samples, I |
| 09:53:08 | 25 | believe, about a month ago.  So those products are also, |

09:53:12    1    from our perspective, part of the case, as well.  And

09:53:17    2    that's -- ████████████████ are referenced in Paragraph 43.

09:53:33    3         THE COURT:  All right.  Mr. Erwine, those are the

09:53:48    4    primary questions I had about this.  If you have other

09:53:53    5    argument, though, I don't want to preempt it.

09:53:57    6         MR. ERWINE:  No, Your Honor.  I think that --

09:53:59    7    that's it.  Thank you for your time and appreciate your

09:54:03    8    consideration.

09:54:04    9         THE COURT:  All right.  Mr. Phillips, if you have

09:54:11   10    responsive argument, go ahead.

09:54:11   11         MR. PHILLIPS:  Just a few things, Your Honor.

09:54:13   12         Obviously, given the time, I'm not going to go

09:54:16   13    through every paragraph in the complaint that was just

09:54:18   14    cited to you.  It was a bunch that went beyond what's in

09:54:22   15    the briefing, I might also add.  But that said, Your Honor,

09:54:27   16    when you get a chance to look at these paragraphs, do take

09:54:31   17    a look at what's actually being alleged that these trade

09:54:33   18    secrets -- supposed trade secrets are doing for Defendants.

09:54:35   19         In Paragraph 66, there's an allegation that the

09:54:42   20    trade secrets ████████████████████████████████████.

09:54:45   21         Similarly, Paragraph 161, ████████████████████████

09:54:48   22    ████████████████████.

09:54:49   23         Your Honor, it's undisputed here, all the R&D, all

09:54:51   24    the processing, all the manufacturing, ████████████████████

09:54:54   25    ████████████████████████████  ████████████████████

09:54:57    1    ██████████████████████████.

09:55:01    2    And one place where this comes clear, Your Honor,

09:55:04    3    is actually if you go back and you look at that case that

09:55:08    4    was cited to you, the Motorola case -- it's Motorola

09:55:12    5    Solutions v. Hytera -- there, a motion to amend is granted.

09:55:17    6    And if you look -- this is at Page 488 -- there's an

09:55:20    7    allegation that products embodying the trade secrets, the

09:55:23    8    stolen trade secrets, were marketed at numerous trade shows

09:55:28    9    in the United States.

09:55:29    10    So now we've got a product where -- not the way it

09:55:33    11    was R&D or the way it's manufactured, but the product

09:55:35    12    itself embodies trade secrets, and it's being use at trade

09:55:38    13    shows, like, hey, look at this cool thing we've got.

09:55:42    14    That's a different case than what we have here, Your Honor,

09:55:44    15    at least what's been alleged.

09:55:46    16    So unless you have any other questions, Your

09:55:49    17    Honor.

09:55:49    18    THE COURT:  I do not at the moment.  Thank you.

09:55:53    19    MR. PHILLIPS:  Thank you, Your Honor.

09:55:53    20    THE COURT:  I will look further at both the

09:56:03    21    amended complaint and at the authorities and try to get

09:56:10    22    something out promptly on this motion.

09:56:12    23    Let's move to the next motion, which is the

09:56:20    24    Defendants' motion to strike the amended infringement

09:56:29    25    contentions.

| | | |
|---|---|---|
| 09:56:38 | 1 | MR. MCLAUGHLIN:  Good morning, Your Honor. |
| 09:56:48 | 2 | Brendan McLaughlin for Defendants.  May I approach? |
| 09:56:51 | 3 | THE COURT:  Yes. |
| 09:57:16 | 4 | MR. MCLAUGHLIN:  Your Honor, Volta's motion to |
| 09:57:19 | 5 | strike is -- boils down to a fairly simple issue for us. |
| 09:57:27 | 6 | So on June 4th, SKn served amended infringement |
| 09:57:34 | 7 | contentions, and in those amended infringement |
| 09:57:36 | 8 | contentions, they included for the first time a new |
| 09:57:40 | 9 | contention regarding a wrinkles limitation in Claim 1 of |
| 09:57:47 | 10 | the '541 patent. |
| 09:57:48 | 11 | And I think it's helpful to take a look through |
| 09:57:52 | 12 | the history that kind of led up to this point. |
| 09:57:55 | 13 | So on May 29th of last year, SKn served its |
| 09:58:01 | 14 | initial infringement contentions, and in those infringement |
| 09:58:06 | 15 | contentions, they included two different limitations in one |
| 09:58:08 | 16 | of their claim charts. |
| 09:58:10 | 17 | So we have here the wherein the copper foil has a |
| 09:58:14 | 18 | tensile strength of 30 to 40 kilogram force per millimeter |
| 09:58:22 | 19 | squared.  That's kind of the first limitation. |
| 09:58:23 | 20 | And the second is so as to prevent the generation |
| 09:58:26 | 21 | of wrinkles at a surface of the copper foil. |
| 09:58:30 | 22 | So in SKn's chart, they do expressly plead on |
| 09:58:35 | 23 | information and belief Defendants' battery copper foils |
| 09:58:40 | 24 | have a tensile strength of 30 to 40 kilogram force per |
| 09:58:45 | 25 | millimeter squared.  But notably, they are completely |

09:58:50    1    silent as to the wrinkle limitation.  Nothing in the

09:58:52    2    infringement contentions regarding that.

09:58:54    3         So moving forward in December, the parties had

09:59:01    4    agreed to supplement infringement contentions and

09:59:05    5    invalidity contentions on December 23rd.  On December 23rd,

09:59:11    6    we received their amended infringement contentions.  And

09:59:15    7    once again, they kind of grouped those two limitations

09:59:18    8    together, and they were completely silent as to wrinkles.

09:59:24    9    Nothing in their claim chart regarding wrinkles, except for

09:59:28    10   when they just recite the claim language in the left side

09:59:31    11   of the claim chart.

09:59:33    12        But, again, it is just purely on information and

09:59:38    13   belief, Defendants' product had a tensile strength of 30 to

09:59:48    14   40 kilogram force per millimeter squared.

09:59:50    15        Several months later, the parties had submitted to

09:59:53    16   the Court a joint motion to amend the docket control order

09:59:58    17   on May 27th.  And in that -- in that proposed order, the

10:00:04    18   parties include a footnote that said, you know, the parties

10:00:08    19   agree to further amendments to their infringement and

10:00:12    20   invalidity contentions in view of documents that had been

10:00:15    21   produced, would be produced, and any theories that -- or,

10:00:19    22   I'm sorry, not theories -- any additional testing that

10:00:22    23   might be done to determine some of the properties.

10:00:27    24        But the thing that the parties expressly agreed to

10:00:30    25   was that no new theories would come in.  The parties would

10:00:34  1  make sure that any theories that were in these amended

10:00:38  2  infringement contentions on June 4 would be consistent with

10:00:42  3  what had previously been presented.

10:00:44  4      One other thing that I'd like to note.  So the

10:00:48  5  same day that the parties proposed this -- this joint order

10:00:51  6  to the Court, the Court issued its claim construction

10:00:54  7  order.  And in that claim construction order, the Court,

10:00:58  8  amongst other terms, construed the wrinkles limitation.

10:01:02  9  And it construed it to mean such that a surface of the

10:01:06  10  copper foil has no wrinkles.

10:01:10  11      Several days later, the Court entered the amended

10:01:13  12  docket control order that included this footnote.

10:01:20  13      On June 4th, we received -- we received SKn's

10:01:25  14  amended infringement contentions, and we were surprised to

10:01:30  15  see that it did include new theories, and there are kind of

10:01:35  16  two different issues that came up with those amended

10:01:39  17  contentions.

10:01:40  18      The first is that for the first time on June 4th,

10:01:46  19  we had an express reference to the wrinkles limitation, you

10:01:51  20  know, and this was something that -- as we showed earlier,

10:01:55  21  was something that was completely missing from the May and

10:02:00  22  December 2024 infringement contentions.  But now, SKn

10:02:07  23  provides this new theory.

10:02:11  24      The second new theory -- and this is something

10:02:15  25  that SKn just, you know, didn't address in its opposition

10:02:19  1  brief was this DOE theory.  And, you know -- and it seems

10:02:25  2  like it's undisputed that these are new and that they

10:02:29  3  shouldn't be included within the contentions.  But we think

10:02:32  4  that there are these two distinct things that were added

10:02:36  5  and were completely new with the June 4th contentions.

10:02:40  6       THE COURT:  Tell me about how the statement that

10:02:44  7  there are no wrinkles is a new theory.

10:02:48  8       MR. MCLAUGHLIN:  It was something that just had

10:02:50  9  never been addressed by Plaintiff before.  With their

10:02:56  10  infringement contentions, they just -- they seemed to

10:02:59  11  interpret that as a -- kind of a non-limitation and they

10:03:05  12  seemed to take the position that they needed -- didn't need

10:03:07  13  to address it.

10:03:08  14       But then when the Court issued its claim

10:03:10  15  construction order, it seems as though they believe that,

10:03:15  16  well, this is a limitation, this is something that we need

10:03:17  17  to expressly address, which is what they did with the June

10:03:21  18  4th contentions.

10:03:29  19       THE COURT:  All right.

10:03:30  20       MR. MCLAUGHLIN:  And leading into that claim

10:03:32  21  construction issue, when we received these contentions, we

10:03:34  22  wanted to follow up and say, okay, well, have you -- did

10:03:40  23  you amend these contentions, kind of under the DCO where we

10:03:45  24  had the footnote that said no new theories, or was this in

10:03:49  25  view of the claim construction order which had issued a

10:03:51   1    couple days earlier?

10:03:52   2         And SKn responded in no uncertain terms that, no,

10:03:59   3    this was not anything that was in response to the claim

10:04:02   4    construction order.  This is in response to the -- this was

10:04:09   5    in response to the DCO.

10:04:18   6         So with these new theories, especially this late

10:04:21   7    in the case, we believe that they should be struck.  And

10:04:24   8    the one argument -- the one other argument that I'd like to

10:04:29   9    address -- and this is skipping ahead to Slide 19.

10:04:37  10         So SKn in their opposition makes a big deal about

10:04:45  11    the Volta witness who said that the -- you know, who

10:04:48  12    allegedly said that the ██████████████████ was something

10:04:52  13    that might not be reliable.

10:04:56  14         But in 2024, well before that deposition, we had

10:05:01  15    produced this document on the right, and that was

10:05:04  16    something -- if they really wanted to include it with, you

10:05:08  17    know, this wrinkle issue, they could have cited that in

10:05:13  18    their December contentions.  That was before they had any

10:05:15  19    kind of testimony that this might be unreliable or anything

10:05:19  20    like that.  But they did not.

10:05:20  21         And you can -- you can see -- you know, even if

10:05:25  22    they had known that might have been something that wasn't

10:05:31  23    reliable, well, ████████████████████████████████

10:05:36  24    ████████████████████████████████████████

10:05:38  25    ██████████████████████████████████████████.

10:05:45  1          And unless Your Honor has any further questions.

10:05:48  2          THE COURT:  Not at the moment, Mr. McLaughlin.

10:05:50  3  Thank you.

10:06:00  4          MS. YANG:  Good morning, Your Honor.  Chunmeng

10:06:05  5  Yang on behalf of the Plaintiff.

10:06:07  6          May I approach with copies of the slides?

10:06:31  7          THE COURT:  Yes.

10:06:31  8          MS. YANG:  Thank you, Your Honor.  Our position is

10:06:33  9  that the amendment being challenged here was permitted by

10:06:35  10  the amended docket control order, which expressly allowed

10:06:38  11  the parties to amend their respective contentions with,

10:06:43  12  quote, additional documents obtained so long as the theory

10:06:46  13  is consistent.

10:06:47  14          THE COURT:  Why was there no reference before to

10:06:52  15  the wrinkles issue?

10:06:53  16          MS. YANG:  Great question, Your Honor.

10:06:56  17          Quite frankly, when we served our December 2024

10:07:00  18  contentions, we did not have direct evidence that the

10:07:04  19  limitation was literally met.  ███████████████████  that

10:07:10  20  we're relying on here was produced for the first time about

10:07:13  21  a month before the close of fact discovery.  From our

10:07:17  22  perspective, that document frankly should have been part of

10:07:21  23  Defendants' core technical production that should have come

10:07:24  24  with their initial invalidity contentions, not a month

10:07:27  25  before fact discovery closed.

| | | |
|---|---|---|
| 10:07:30 | 1 | And I would like to address the last argument that |
| 10:07:33 | 2 | counsel made regarding the other specification that was |
| 10:07:39 | 3 | purportedly produced in November 2024 that had the same |
| 10:07:43 | 4 | language. |
| 10:07:44 | 5 | It's Exhibit 9 to Defendants' motion.  When you |
| 10:07:49 | 6 | look at the document, every page has this neon yellow |
| 10:07:54 | 7 | header on top that says: ███████████████████████ |
| 10:07:59 | 8 | ████████████████████████.  The document number |
| 10:08:03 | 9 | starts with TMP which we believe means temporary.  When you |
| 10:08:08 | 10 | look at the contents of the document itself, above where it |
| 10:08:12 | 11 | said, you know, wrinkles, the document states: ███ |
| 10:08:16 | 12 | ████████████████████████████  ██████████ |
| 10:08:20 | 13 | ██████████████████████. |
| 10:08:21 | 14 | So when we reviewed this document, we had a |
| 10:08:24 | 15 | suspicion that the requirements set forth in here are |
| 10:08:29 | 16 | inapplicable to the copper foils that Defendants ended up |
| 10:08:32 | 17 | selling to ████ at scale. |
| 10:08:34 | 18 | And when we deposed Defendants' witnesses later, |
| 10:08:40 | 19 | our suspicion was confirmed.  Specifically, Volta's witness |
| 10:08:45 | 20 | Mr. Jun, who was the director of quality assurance, when he |
| 10:08:50 | 21 | was asked about Exhibit 9 to Defendants' motion, is this |
| 10:08:53 | 22 | the final version of ████████████████████████ |
| 10:08:56 | 23 | ████████████████, he testified no.  And he further |
| 10:09:02 | 24 | explained:  This is a document that we proposed to be a |
| 10:09:05 | 25 | ██████████████████████, but they did not sign off |

| | | |
|---|---|---|
| 10:09:09 | 1 | on it.  Instead, they just provided us with their material |
| 10:09:14 | 2 | specifications. |
| 10:09:14 | 3 | And the last part, their material specifications, |
| 10:09:21 | 4 | refers to ██████████████ that was not produced |
| 10:09:23 | 5 | until May that we ultimately relied on in our June 2025 |
| 10:09:26 | 6 | contentions. |
| 10:09:32 | 7 | THE COURT:  What about the DOE amendment? |
| 10:09:36 | 8 | MS. YANG:  Yes, Your Honor.  I believe we stated |
| 10:09:39 | 9 | our position in a recent motion to exclude our expert |
| 10:09:44 | 10 | opinion.  Our doctrine of equivalents theory is withdrawn. |
| 10:09:48 | 11 | There is no outstanding DOE theory that's at issue here. |
| 10:09:52 | 12 | THE COURT:  All right. |
| 10:10:06 | 13 | MS. YANG:  Your Honor, this slide kind of sets |
| 10:10:11 | 14 | forth a side-by-side comparison of the theories that we |
| 10:10:14 | 15 | presented in the December 2024 contention and the latest |
| 10:10:19 | 16 | set of contentions.  And as you can see, the asserted |
| 10:10:23 | 17 | claims stayed exactly the same.  We did not change the |
| 10:10:27 | 18 | scope of the accused products.  We pled literal |
| 10:10:33 | 19 | infringement verbatim. |
| 10:10:35 | 20 | And Defendants made arguments about the way that |
| 10:10:37 | 21 | we chose to present our infringement contentions, namely by |
| 10:10:41 | 22 | combining the tensile strength limitation and no wrinkles |
| 10:10:45 | 23 | limitation in one row.  That did not change either. |
| 10:10:48 | 24 | The only change for purposes of the motion that we |
| 10:10:51 | 25 | made was to supplement our previously disclosed theory with |

10:10:55  1    this newly produced evidence.

10:10:57  2            And, Your Honor, to further address kind of the --

10:11:03  3    the diligence argument, that's really part of the good

10:11:06  4    cause inquiry that the Court is considering using the

10:11:11  5    four-factor test here.  These four factors are not

10:11:14  6    addressed in Defendants' motion at all, so essentially our

10:11:18  7    arguments here are not rebutted.  But I'll go through the

10:11:24  8    factors briefly.

10:11:25  9            So the first factor, the explanation for why we

10:11:28  10   could not have incorporated ██████████████ back in

10:11:33  11   December 2024, the answer is simple.  The document was not

10:11:35  12   produced.  And Defendants showed earlier that we made some

10:11:39  13   reference to the testing of the samples.  Those samples

10:11:43  14   were not produced until April of 2025 either.  So they were

10:11:46  15   not available to us back in December of 2024.

10:11:48  16           The second factor goes to the importance of the

10:11:52  17   amendment.  The amendment is important because ██████

10:11:56  18   specification is direct evidence of literal infringement,

10:11:58  19   and we did not have the evidence before.

10:12:01  20           The third factor, prejudice.  Defendants are not

10:12:05  21   prejudiced here because ██████████████████ is

10:12:10  22   Defendants' own document.  They did not need to take any

10:12:12  23   fact discovery regarding it.

10:12:14  24           And, Your Honor, if I may, in -- as early as March

10:12:21  25   2025, Defendants served non-infringement contentions that

10:12:26  1  clearly set forth their non-infringement argument with

10:12:28  2  respect to this limitation.  They did not say that they

10:12:31  3  were confused whether the no wrinkles limitation was part

10:12:36  4  of the tensile strength limitation.  They addressed this

10:12:39  5  limitation by itself.  They showed this image purportedly

10:12:44  6  showing wrinkles in their foils.  And this is the same

10:12:47  7  non-infringement argument that they're presenting today.

10:12:50  8  So not only did they understand our theory, they had plenty

10:12:55  9  of opportunity to rebut it.

10:12:56  10         So in summary, our position is that the amendment

10:12:59  11  we made was permitted under the amended DCO, but even if

10:13:03  12  Your Honor feels like the Court needs to reach the good

10:13:06  13  cause inquiry, our amendment would also be permissible

10:13:11  14  because of the good cause that's been established here.

10:13:14  15         THE COURT:  All right.

10:13:14  16         MS. YANG:  Thank you, Your Honor.

10:13:15  17         THE COURT:  Thank you, Ms. Yang.

10:13:16  18         Mr. McLaughlin, if you have anything further, you

10:13:22  19  may respond.

10:13:23  20         MR. MCLAUGHLIN:  Nothing further, Your Honor.

10:13:25  21         THE COURT:  All right.  Then let's move on to the

10:13:27  22  last motion, which is the Plaintiff's motion to strike.

10:13:50  23         MR. YIN:  Your Honor, John Yin on behalf of the

10:14:26  24  Plaintiff, SK nexilis.

10:14:27  25         We do have a few slides, if we may approach the

10:14:31    1    bench to distribute them.

10:14:32    2         THE COURT:  All right, Mr. Yin.

10:15:00    3         MR. YIN:  Your Honor, this motion has a lot of

10:15:03    4    confusing acronyms and products involved.  So if it's okay

10:15:08    5    with Your Honor, I would like to start with kind of a brief

10:15:12    6    explanation of the different prior art products involved in

10:15:14    7    this case.

10:15:16    8         THE COURT:  All right.

10:15:16    9         MR. YIN:  So the motion concerns a category of

10:15:32    10    prior art foils known as CFL foils, and CFL stands for

10:15:38    11    Circuit Foil Luxembourg.  It's a company based in Europe,

10:15:42    12    and it was acquired by Defendant Solus around 2020.  So

10:15:47    13    Solus, the Defendant, owns CFL.  And it really refers to

10:15:51    14    multiple distinct pieces of prior art.

10:15:58    15         CFL-10, as Your Honor can see from the bottom left

10:16:00    16    corner, this refers to -- excuse me -- this refers to a

10:16:04    17    piece of prior art that the Defendants' employee or

10:16:11    18    consultant -- former employee or consultant, Mr. Streel,

10:16:16    19    identified in his binder located at CFL.  It's referred to

10:16:20    20    as CFL-10.

10:16:21    21         Now, ███████████████████████████████

10:16:28    22    ██████████████████    ██████████████████

10:16:32    23    ████████████    ███████ had provided a number of different

10:16:35    24    prior art foils in this case before fact discovery had even

10:16:39    25    begun, in April 2024.  And specifically at issue here,

10:16:45 1 there's a foil named ███ 10 micron, the top right corner.

10:16:50 2 There are about a dozen pieces of them. There's ███ 12

10:16:55 3 micron, also known as CFL-12. And there's ███ 18 micron,

10:17:01 4 known as CFL-18.

10:17:02 5 And the prior art copper foils at issue are CFL-10

10:17:07 6 on the bottom left and CFL-12 and 18 on the right-hand

10:17:12 7 side.

10:17:12 8 Now, as I mentioned, Mr. Streel collected the

10:17:23 9 CFL-10 foil at CFL. So it had been owned by the Defendant.

10:17:31 10 It was in Defendants' possession since at least 2020 when

10:17:35 11 CFL was acquired by the Defendant Solus.

10:17:38 12 Despite having acquired the CFL-10 prior art in

10:17:45 13 2020, Defendants did not disclose it or even name CFL-10

10:17:51 14 until April 30th, 2025. That was about a month, month and

10:17:56 15 a half before the close of fact discovery. And it was also

10:18:03 16 disclosed one day before Mr. Streel was scheduled to be

10:18:07 17 deposed.

10:18:14 18 Now, did Defendant provides samples of CFL-10 to

10:18:19 19 SKn to verify? No. They didn't do that until May 29th,

10:18:23 20 which also happens to be one business day before Mr. Streel

10:18:26 21 was scheduled to be deposed for a second time.

10:18:28 22 So what I've highlighted here, Your Honor, in

10:18:31 23 yellow on the timeline is the one-month period during which

10:18:37 24 SKn had learned about the existence of CFL-10 to having to

10:18:41 25 depose Mr. Streel twice, all at the same time with no test

10:18:46  1  data of CFL-10 and having no access to it, compared against

10:18:52  2  the five-plus years during which Defendants had possession

10:18:55  3  of CFL-10.

10:18:56  4  　　　　Moving on to CFL-12 and 18, these are the two

10:19:09  5  pieces of prior art foils that ██████████████████████.

10:19:12  6  　　　　Now, the CFL-12 and 18 foils were shipped to

10:19:17  7  counsel for Defendants on April 10th, 2024.  You can see

10:19:23  8  the shipping label on the left-hand side.  They were in

10:19:27  9  Defendants' possession since 2024.  That was about a month

10:19:31  10  before fact discovery had commenced.

10:19:33  11  　　　　On the bottom of this slide, we show the start of

10:19:36  12  fact discovery on May 29th, 2024.  And during the 13-month

10:19:42  13  period of fact discovery, they weren't disclosed.  SKn had

10:19:48  14  requested for prior art samples in the RFP letter.  On June

10:19:52  15  21st, right at the start of fact discovery, we requested

10:19:57  16  all documents and things that relate to device, products,

10:19:59  17  systems, apparatus, or other instrumentalities that

10:20:03  18  Defendant contend are prior art to the asserted claims.

10:20:06  19  　　　　However, it was not until May 29th, 2025, almost a

10:20:14  20  year later, that Defendants finally delivered their samples

10:20:17  21  of the ████ foils, CFL-12, 18, and the ████ 10 micron foils

10:20:26  22  for SKn for testing.

10:20:27  23  　　　　So to put this in perspective, Your Honor, we've

10:20:31  24  laid out the different iterations of invalidity

10:20:34  25  contentions.  August 2024, this was the original invalidity

| | | |
|---|---|---|
| 10:20:37 | 1 | contentions for the Defendants, and this was about four |
| 10:20:45 | 2 | months after Defendants had acquired the CFL foils from |
| 10:20:49 | 3 | ███ |
| 10:20:50 | 4 | Now, they served 24 invalidity charts.  The last |
| 10:20:52 | 5 | one of those 24 was a chart named System Prior Art.  And |
| 10:20:57 | 6 | within that chart, they identified 32 different system |
| 10:21:01 | 7 | prior art, but no chart specifically mapping any of the |
| 10:21:07 | 8 | prior art foils, CFL-12, 18, or 10 from Mr. Streel's binder |
| 10:21:13 | 9 | to the specific limitations of the asserted claims.  No |
| 10:21:16 | 10 | claim -- no element-by-element mappings. |
| 10:21:21 | 11 | Next iteration, February 2025.  This was after SKn |
| 10:21:28 | 12 | had served a -- supplemental infringement contentions after |
| 10:21:32 | 13 | receiving samples of the accused product. |
| 10:21:36 | 14 | February 2025, Defendants served seven additional |
| 10:21:41 | 15 | charts mapping out alleged theories of invalidity based on |
| 10:21:46 | 16 | a range of different products that they had tested in 2024, |
| 10:21:51 | 17 | including, you know, copper foils extracted from cell |
| 10:21:55 | 18 | phones like the iPhone, certain Android devices.  They also |
| 10:21:59 | 19 | included a chart known as Chart C-4 for the CFL foils, but |
| 10:22:06 | 20 | there they had only tested CFL-18, not Mr. Streel's CFL-10, |
| 10:22:11 | 21 | not the CFL-12, and they also did not provide |
| 10:22:14 | 22 | limitation-by-limitation mapping against the '541 patent. |
| 10:22:20 | 23 | They've only charted CFL-18 against four of the asserted |
| 10:22:26 | 24 | patents. |
| 10:22:26 | 25 | And that brings us to the invalidity contentions |

10:22:31   1   at issue in this case -- the June 4th invalidity

10:22:33   2   contentions.  Two notable pieces, Your Honor.  The first

10:22:38   3   new theory was that Defendants finally identified the CFL

10:22:44   4   foils or mapped the CFL foils against the limitations of

10:22:49   5   the '541 patent.

10:22:51   6        The second theory -- the second new theory is they

10:22:55   7   finally provided some test data -- not all of it, some test

10:22:59   8   data of the CFL-10 and 12 foils.

10:23:05   9        So what's shown on this screen, Your Honor, is

10:23:11  10   Defendants' opposition brief, and they have claimed that

10:23:14  11   they had diligently supplemented thought discovery.  But

10:23:19  12   notably, Your Honor, the first entry that they included was

10:23:25  13   a supplemental interrogatory response in April of 2025.

10:23:30  14   They didn't identify anything before that.

10:23:34  15        So for a period of about 12 months, and there was

10:23:39  16   no evidence included in Defendants' opposition brief at

10:23:45  17   least that goes to show their purported diligence.

10:23:48  18        And I think the case law here is undisputed.  This

10:23:51  19   Court has found before that the lack of diligence alone is

10:23:53  20   sufficient to deny Defendants' motion for leave to

10:23:57  21   supplement invalidity contentions.  In this case, they

10:23:59  22   didn't move, but I think the same -- the same -- we'll

10:24:04  23   submit to the Court that the same logic applies.

10:24:07  24        And this Court has also found that a two-month

10:24:11  25   delay before the contentions deadline showed a complete

| | |
|---|---|
| 10:24:14 | 1 |
| 10:24:16 | 2 |
| 10:24:19 | 3 |
| 10:24:24 | 4 |
| 10:24:29 | 5 |
| 10:24:36 | 6 |
| 10:24:37 | 7 |
| 10:24:41 | 8 |
| 10:24:42 | 9 |
| 10:24:45 | 10 |
| 10:24:53 | 11 |
| 10:24:56 | 12 |
| 10:25:01 | 13 |
| 10:25:03 | 14 |
| 10:25:08 | 15 |
| 10:25:11 | 16 |
| 10:25:11 | 17 |
| 10:25:14 | 18 |
| 10:25:17 | 19 |
| 10:25:23 | 20 |
| 10:25:26 | 21 |
| 10:25:30 | 22 |
| 10:25:35 | 23 |
| 10:25:38 | 24 |
| 10:25:43 | 25 |

1  lack of diligence.

2      And I'll just draw to Your Honor's attention that

3  in the Allure Energy case on the bottom, the prior art

4  issue was on the third party.  But here, all of the prior

5  art were in Defendants' sole possession long before fact

6  discovery had even started.

7      So with that, I'll pause for now and see if

8  Your Honor has any questions.

9      THE COURT:  Not at the moment, Mr. Yin.

10      MR. YIN:  So there are several kind of excuses

11  that Defendants have raised in their opposition brief.

12  I'll just briefly go through a few of them.

13      I think the main response we heard from the

14  Defendants was that, well, all of the prior foils, they're

15  really just one piece of prior art.  They're not distinct

16  prior art.

17      I think, again, what's shown on the screen is

18  quoted from Defendants' opposition brief, and here they

19  claim that SKn's suggestion that CFL-10, 12, 18 all

20  represent different products is incorrect, and they're all

21  manufactured from the same processes, and their only

22  difference is their thicknesses, well, that's not exactly

23  true, and that's according to Defendants' own expert.

24      First of all, Defendants' testing expert treated

25  the prior art foils as distinct pieces of prior art.  You

| | | |
|---|---|---|
| 10:25:47 | 1 | will see that Mr. Kaschmitter, Defendants' testing expert, |
| 10:25:53 | 2 | identified the iPhone 1, the Samsung Eternity, as well as |
| 10:26:00 | 3 | the CFL-10 and CFL-12 as distinct pieces of prior art.  He |
| 10:26:05 | 4 | offered different test data for them.  He offered different |
| 10:26:10 | 5 | test methodologies for the different pieces of prior art. |
| 10:26:13 | 6 | They were not treated collectively as a CFL foil prior art. |
| 10:26:21 | 7 | That's number one. |
| 10:26:21 | 8 | Number two, Defendants' other technical expert, |
| 10:26:27 | 9 | Dr. Arnold, also testified that they're different.  Here's |
| 10:26:31 | 10 | from Dr. Arnold's opening report.  He contended that CFL-18 |
| 10:26:37 | 11 | was really a -- really has a different formulation than the |
| 10:26:40 | 12 | CFL-10 and CFL-12 foils.  He said:  No, I don't rely on |
| 10:26:45 | 13 | CFL-18 for anticipation and obviousness.  He confirmed the |
| 10:26:50 | 14 | same during his deposition.  He said it's not the same |
| 10:26:52 | 15 | thing.  CFL-18 is not the same foil as CFL-10 or CFL-12. |
| 10:26:56 | 16 | But CFL-18 was the only foil that Defendants |
| 10:27:01 | 17 | timely disclosed.  It was the only foil contained in their |
| 10:27:07 | 18 | February 2025 invalidity contentions.  The pictures showed |
| 10:27:10 | 19 | the collection of CFL-18 foils that Defendants tested and |
| 10:27:13 | 20 | disclosed in February 2025.  No CFL-10 or 12 was disclosed |
| 10:27:19 | 21 | or charted. |
| 10:27:21 | 22 | So I think at this point it's been disputed, Your |
| 10:27:29 | 23 | Honor, that CFL-10 and 12 are different prior art than the |
| 10:27:33 | 24 | CFL-18 that Defendants disclosed and charted in February of |
| 10:27:36 | 25 | 2025. |

| | | |
|---|---|---|
| 10:27:37 | 1 | I think Defendants also relied on the case GREE |
| 10:27:46 | 2 | versus Supercell to kind of support the notion that |
| 10:27:51 | 3 | invalidity contentions need not include all of the |
| 10:27:57 | 4 | evidence, but I think the situation we face here is vastly |
| 10:28:00 | 5 | different. In the GREE versus Supercell case, Defendants |
| 10:28:06 | 6 | had already identified the accused features in the prior |
| 10:28:10 | 7 | art product. They identified a game known as FarmVille, I |
| 10:28:16 | 8 | believe, as the prior art, and they identified the neighbor |
| 10:28:21 | 9 | gifting feature as the feature that mattered for the prior |
| 10:28:24 | 10 | art. All they did was to supplement an additional YouTube |
| 10:28:29 | 11 | video showing the exact same feature with the exact same |
| 10:28:32 | 12 | prior art. |
| 10:28:33 | 13 | That's not the case here. We're seeing two |
| 10:28:35 | 14 | completely new prior art being charted for the first time |
| 10:28:39 | 15 | to map to the limitations, and we're seeing a completely |
| 10:28:42 | 16 | new theory against the '541 patent. |
| 10:28:45 | 17 | I will skip to maybe another one of the more |
| 10:29:02 | 18 | important excuses raised in Defendants' opposition. |
| 10:29:10 | 19 | Ms. Yang, can you navigate to Page 33? |
| 10:29:13 | 20 | Now, Your Honor, another issue that Defendants |
| 10:29:20 | 21 | raised in their opposition was that, well, they had to wait |
| 10:29:24 | 22 | for SKn's testing of the accused products for infringement |
| 10:29:26 | 23 | purposes in order to know what to test or how to carry out |
| 10:29:31 | 24 | the testing for their own CFL foils. And here is, again, a |
| 10:29:39 | 25 | kind of screenshot of the opposition brief from the |

10:29:45    1    Defendants.

10:29:45    2            But the patents themselves disclosed clearly what

10:29:48    3    the testing methodologies are.  We have two examples from

10:29:53    4    the '541 patent and from the '706 patent identifying not

10:29:56    5    only the testing methodology, the standard to use, the

10:30:01    6    machine, equipment used to test it and how to refer to the

10:30:05    7    machine.  There's no doubt where the testing methodologies

10:30:10    8    for the claimed properties are.

10:30:12    9            And Defendants' testing expert didn't need to rely

10:30:17    10    on SKn's guidance in order to test the CFL prior art.  Here

10:30:20    11    is screenshot from Mr. Kaschmitter's opening report where

10:30:27    12    he said he considered the asserted patents and the various

10:30:33    13    testing standards, all of which are disclosed in the patent

10:30:39    14    specification itself, and he didn't list SK nexilis's

10:30:41    15    infringement contentions as something he had considered in

10:30:44    16    order to learn how to test CFL foils.

10:30:48    17            And, lastly, Defendants didn't wait for SKn's

10:30:52    18    infringement contentions.  SKn's infringement contentions

10:30:55    19    that identified our testing of the accused products was

10:30:58    20    served on December 23rd, 2024, but Defendants had already

10:31:05    21    completed testing for a number of tests way before that.

10:31:09    22            In the blow-out on the right-hand side, Your Honor

10:31:12    23    can see the different prior art samples, including, I

10:31:18    24    believe, Row 6 and 7 indicate that the CFL-18 foil that

10:31:22    25    they had tested.  But notably absent from here is CFL-10 or

10:31:28    1    12, which they ultimately relied on for their invalidity

10:31:32    2    case.

10:31:32    3        Now, one last piece of response from Defendants'

10:31:43    4    opposition brief that I would like to address, Your Honor,

10:31:45    5    is the idea that the Court's claim construction order

10:31:48    6    somehow necessitate -- necessitated the need to provide

10:31:51    7    their new CFL-based invalidity theory.

10:31:58    8        Now, the Court's claim construction order did not

10:32:00    9    require any testing.  To kind of provide a little bit of

10:32:04   10    context, Your Honor, the claimed property at issue is

10:32:09   11    something known as surface roughness.  They're measured by

10:32:15   12    a stylist in running across the surface of the accused

10:32:15   13    copper foil or the prior art copper foil.

10:32:19   14        And at the end of the run, which takes about 5 to

10:32:22   15    10 minutes, it gives you a printout of all the different

10:32:28   16    properties.  The testing is the same.

10:32:31   17        What the claim construction order provided was --

10:32:33   18    well, let me backtrack.  Defendants' argument during claim

10:32:36   19    construction was that a person of skill in the art wouldn't

10:32:39   20    know which number to report, whether to report the number

10:32:45   21    of peaks on the surface of the copper foil over the

10:32:50   22    reference length of formula meter or over reference length

10:32:54   23    of 1 centimeter.  It's simply a numerical calculation.  The

10:33:00   24    number of peaks over the number of -- over 1 centimeter is

10:33:03   25    divided by 2.5, and you get the number of peaks over

10:33:07   1   4 millimeter.  It's the same test, and it takes only about

10:33:11   2   5 to 10 minutes to run.

10:33:12   3        And Defendants -- there's no reason Defendants

10:33:16   4   couldn't have carried out the test and reported about it

10:33:19   5   before the claim construction.  There's nothing in the

10:33:22   6   claim construction order that necessitated additional

10:33:24   7   testing.  Really the only reasonable explanation here or

10:33:27   8   the logical explanation is that Defendants simply chose not

10:33:31   9   to test CFL-10 or 12 when they should have done so and

10:33:37  10   disclosed their theories.

10:33:44  11        If Your Honor has no further questions, I'll move

10:33:47  12   on to my last point, which is the prejudice to SKn, which I

10:33:53  13   believe is the third factor in a four-factor test.

10:33:58  14        THE COURT:  All right.

10:33:59  15        MR. YIN:  Now, Defendants' position in their

10:34:06  16   opposition brief was that, well, SKn did not articulate any

10:34:11  17   particularized prejudice they had suffered from the late

10:34:16  18   disclosure.  Well, I think the timeline speaks for itself.

10:34:20  19   Defendants -- it was Defendants' burden to disclose their

10:34:23  20   invalidity theory early on in order to provide notice.

10:34:27  21   They've held on to the CFL-10 foil from Mr. Streel's binder

10:34:33  22   since 2020.  They didn't disclose it until one month before

10:34:35  23   fact discovery closed.  And they disclosed it right before

10:34:38  24   each of Mr. Streel's deposition.

10:34:42  25        For the CFL-12 foil, they acquired the foils,

10:34:48  1  again, before fact discovery had even commenced and despite

10:34:52  2  SKn's request, they didn't produce it until the tail end of

10:34:56  3  fact discovery two weeks before fact discovery closed.

10:34:59  4       And it wasn't until expert discovery that it

10:35:10  5  became clear Defendants had no intention to rely on CFL-18

10:35:10  6  foil at all.  They charted it during fact discovery.  They

10:35:14  7  decided to discard it is simply a ruse.  What they had

10:35:21  8  intended to rely on all along was CFL-10 and 12, and those

10:35:25  9  were not charted until it was too late.

10:35:27  10      Now, what should have happened in this case was

10:35:41  11  Defendants should disclose their CFL-10, 12, and 18 foils

10:35:46  12  early on, provide their test data, and crystallize their

10:35:51  13  invalidity theories ahead of time so that SKn would already

10:35:55  14  have the test data in hand when Mr. Streel and Dr. Godon

10:36:00  15  were deposed.  These were the representatives from CFL and

10:36:03  16  ▇▇▇▇▇ respectively.  But that didn't happen.

10:36:09  17      In fact, Mr. Erwine here had to fly to Spain to

10:36:13  18  depose Dr. Godon.  He had to depose Mr. Streel twice over

10:36:18  19  the course of a month, all without any data from CFL-10 or

10:36:21  20  CFL-12 or even any chart mapping these two pieces of prior

10:36:27  21  art against the claim elements of any asserted claims.

10:36:29  22      So from our perspective, Your Honor, this is a

10:36:31  23  clear case of prejudice to SKn.

10:36:40  24      The Defendants also raised the idea during expert

10:36:46  25  discovery that CFL-18 that they had disclosed and tested

| | |
|---|---|
| 10:36:50 | 1 |
| 10:36:53 | 2 |
| 10:37:00 | 3 |
| 10:37:01 | 4 |
| 10:37:04 | 5 |
| 10:37:06 | 6 |
| 10:37:10 | 7 |
| 10:37:13 | 8 |
| 10:37:17 | 9 |
| 10:37:18 | 10 |
| 10:37:22 | 11 |
| 10:37:25 | 12 |
| 10:37:28 | 13 |
| 10:37:31 | 14 |
| 10:37:37 | 15 |
| 10:37:38 | 16 |
| 10:37:38 | 17 |
| 10:37:40 | 18 |
| 10:37:47 | 19 |
| 10:37:50 | 20 |
| 10:37:51 | 21 |
| 10:37:51 | 22 |
| 10:53:01 | 23 |
| 10:53:21 | 24 |
| 10:53:22 | 25 |

1  during fact discovery was not relevant at all, and that was

2  based on a conversation that their expert, Dr. Arnold, had

3  with Mr. Streel.

4        But he could not recall any details from that

5  conversation.  He doesn't recall when that happened.  He

6  doesn't recall what Mr. Streel told him.  Again, these were

7  additional facts that came into play during expert

8  discovery, and that's why SKn did not delay in bringing

9  this motion because it only became clear what Defendants'

10  intentions were through expert discovery.

11        With that, Your Honor, we don't really have, you

12  know, additional points to raise, so I'm happy to address

13  any points that Defendants' counsel would raise.

14        THE COURT:  All right.

15        MR. YIN:  Thank you, Your Honor.

16        THE COURT:  Thank you, Mr. Yin.

17        Before we hear the response, we'll take the

18  morning recess, and then come back hear from Defendant.

19        Take 15 minutes.

20        COURT SECURITY OFFICER:  All rise.

21        (Recess.)

22        COURT SECURITY OFFICER:  All rise.

23        THE COURT:  Thank you.  Please be seated.

24        Mr. Tishman, go ahead.

25        MR. TISHMAN:  All right, Your Honor.  Daniel

| | | |
|---|---|---|
| 10:53:24 | 1 | Tishman for Defendants.  May it please the Court. |
| 10:53:26 | 2 | I also have some slides, and I'll hand them out. |
| 10:53:33 | 3 | May I approach, Your Honor? |
| 10:53:34 | 4 | THE COURT:  Yes. |
| 10:53:35 | 5 | MR. TISHMAN:  So, Your Honor, just to begin, there |
| 10:53:53 | 6 | was -- it may have been unintentional, but there was some |
| 10:53:57 | 7 | suggestion I thought in the argument from the other side |
| 10:53:59 | 8 | that something untoward was done here, and I just want to |
| 10:54:03 | 9 | be clear, Your Honor, we disclosed the documents and the |
| 10:54:05 | 10 | test data as it became available to us throughout |
| 10:54:07 | 11 | discovery.  And I've got a timeline to show that. |
| 10:54:11 | 12 | But if we could start off on Plaintiff's Slide 3, |
| 10:54:55 | 13 | please. |
| 10:54:55 | 14 | THE COURT:  For what it's worth, I have a copy. |
| 10:54:57 | 15 | MR. TISHMAN:  Okay.  Yeah, I'll just talk through |
| 10:54:59 | 16 | it, Your Honor. |
| 10:54:59 | 17 | So on Slide 3, what you see here, Your Honor, is a |
| 10:55:05 | 18 | scan of samples and letters that were provided.  And |
| 10:55:10 | 19 | there's a suggestion throughout the briefing and in the |
| 10:55:13 | 20 | argument that we didn't provide the 10 micron or 12 micron, |
| 10:55:18 | 21 | and there was no disclosure of those. |
| 10:55:20 | 22 | These were produced in August 2023 -- sorry, |
| 10:55:27 | 23 | August 2024 with our initial invalidity contentions.  And |
| 10:55:29 | 24 | what we did in '23 -- in August of 2024 is we asserted that |
| 10:55:36 | 25 | the CFL foils collectively invalidated each and every |

10:55:39   1   limitation of the asserted claims.

10:55:40   2         So that was disclosed early on.  And before I move

10:55:49   3   off of the Defendant -- of the Plaintiff's slides, there

10:55:52   4   was a slide -- and I don't know if you can pull this one

10:55:56   5   up -- I'm not sure if you have it in your copy, Your Honor.

10:56:01   6   It was Slide 15.

10:56:02   7         Do you have -- do you have that slide?  Okay.  So

10:56:06   8   maybe I can just remind you of it, Your Honor.

10:56:08   9         On Slide 15, there was a snippet of our

10:56:12  10   opposition -- of Defendants' opposition, and it said, Volta

10:56:15  11   diligently supplemented throughout discovery, and it showed

10:56:19  12   an entry of August 2025.  And, Your Honor, I want to

10:56:22  13   clarify.  That -- what we were referring to there is our

10:56:26  14   supplementation of interrogatory responses.

10:56:29  15         But I think it's important to take a step back and

10:56:32  16   look at our earlier invalidity contentions which we contend

10:56:35  17   very clearly disclose the theories on which we rely now.

10:56:40  18         So if I can have Defendants' slides, please.

10:56:43  19         Okay.  So, Your Honor, this -- really this motion

10:56:47  20   boils down to a footnote that the parties agreed upon in

10:56:52  21   the second amended docket control order.  And what happened

10:56:57  22   is towards the end of discovery, we agreed that the parties

10:57:00  23   are going to update their contentions once more before

10:57:04  24   discovery ends, and we're going to disclose the test

10:57:07  25   results that are available at that time.  But we're not

60

10:57:09   1   going to do a complete do-over of the theories that the

10:57:13   2   parties are presenting in the case, so we added this

10:57:16   3   footnote to make this clear.

10:57:18   4        But what we did, Your Honor, is we disclosed

10:57:20   5   testing that had been done as of that date by our

10:57:23   6   testifying expert.

10:57:23   7        So on June 4th, 2025, we supplemented our

10:57:28   8   contentions not to disclose a new theory but to disclose

10:57:32   9   new test results that were not available at any point in

10:57:35   10  the case until when we disclosed them on June 4th, 2025.

10:57:39   11       So just to walk through, there's -- there's four

10:57:44   12  factors here that are sort of grayed out on this Slide 3,

10:57:47   13  diligence, prejudice, importance, and Local Rule 3-6.  But

10:57:54   14  our position is that none of those -- you know, we can talk

10:57:57   15  through those, but none of them are required.  We weren't

10:58:01   16  required to meet these good-cause requirements for

10:58:04   17  amendment of contentions because our theory was disclosed

10:58:07   18  timely in our earlier contentions, and all we did in June

10:58:12   19  4th of 2025 was update with testing.

10:58:14   20       THE COURT:  Can you show me what you contend

10:58:19   21  constituted notice to the other side that the 10 and 12

10:58:27   22  thickness materials were alleged as prior art products that

10:58:38   23  invalidated?

10:58:40   24       MR. TISHMAN:  Yeah.  So, Your Honor, I'll talk

10:58:42   25  through some of this timeline, and there I'll show you,

10:58:46    1    Your Honor.  It really starts with our August 23, 2024

10:58:50    2    invalidity contentions.  And so at that stage -- I got a

10:58:55    3    message coming up here if there's a way to take that -- hit

10:59:01    4    ignore.  Sorry.

10:59:01    5         On that date, Your Honor, we disclosed our

10:59:04    6    invalidity contentions, but there was an agreement and

10:59:06    7    understanding among the parties that test results -- it

10:59:10    8    takes a very long time.  Our expert spent upwards of a

10:59:13    9    thousand hours doing tests in this case on numerous

10:59:16    10   different systems.

10:59:17    11        So there was an understanding among the parties

10:59:19    12   that test results would not need to be disclosed that early

10:59:23    13   with those August 23 contentions.

10:59:26    14        But on that date, we disclosed a chart, Exhibit

10:59:34    15   A-24, that mapped collectively prior art systems.  And we

10:59:38    16   explained and argued that testing the prior art systems is

10:59:41    17   going to show that they disclose or render obvious each of

10:59:46    18   the limitations of the asserted patents.

10:59:50    19        And we have a footnote there on that May 2012

10:59:53    20   date, Footnote 32.  And in that, we cite to a letter that

10:59:58    21   disclosed the 12 and the 10 micron foils, and we produced

11:00:04    22   samples of those foils.

11:00:07    23        When we made our production August 2024, we

11:00:10    24   produced the scans of the samples that we had in our

11:00:14    25   possession.  We also produced data sheets that disclosed 9,

| | | |
|---|---|---|
| 11:00:19 | 1 | 10, 12, and 18 micron foils, in addition to these letters |
| 11:00:24 | 2 | that disclose the 12, 10, and 18 micron foils, Your Honor. |
| 11:00:32 | 3 | Now, in February of 2025, we updated our |
| 11:00:35 | 4 | invalidity contentions with testing, and at that time, we |
| 11:00:39 | 5 | just tested -- they're right, we just tested the 18 micron, |
| 11:00:43 | 6 | but we hadn't tested the 10 and 12 micron and held it back. |
| 11:00:47 | 7 | We just hadn't tested it yet as of that date.  But |
| 11:00:51 | 8 | nonetheless, we cited to the data sheets that disclose the |
| 11:00:54 | 9 | 10 and the 12 micron foils. |
| 11:00:56 | 10 | We also alleged in our contentions that the CFL |
| 11:01:03 | 11 | foil discloses each and every limitation of the patents. |
| 11:01:06 | 12 | We just hadn't tested the 10 and 12 micron yet. |
| 11:01:08 | 13 | Now, as to the dates of sale, our earlier |
| 11:01:15 | 14 | contentions listed a 2012 date, but throughout discovery, |
| 11:01:18 | 15 | we learned of evidence of sales that was earlier than 2012, |
| 11:01:21 | 16 | including sales in 2010 to a company called EaglePicher, |
| 11:01:29 | 17 | sales in 2010 to a company called ZettaCore, and we cited |
| 11:01:29 | 18 | the documents related to those sales in our February |
| 11:01:37 | 19 | contentions once it became available to us. |
| 11:01:39 | 20 | Now, this is the -- this here, this 2025 entry |
| 11:01:44 | 21 | that I show here, supplemental interrogatory responses, |
| 11:01:46 | 22 | this is what Mr. Yin was showing earlier when he was |
| 11:01:49 | 23 | talking about our diligence.  And what we're trying to show |
| 11:01:52 | 24 | here, Your Honor, is that we had amended contentions in |
| 11:01:57 | 25 | February of 2025, but as we discovered more documents and |

11:02:01  1  learned new facts, we didn't hold it back.  We continuously

11:02:05  2  and seasonably amended our interrogatory responses.

11:02:08  3        And here's an example of that.  We showed how the

11:02:13  4  CFL foil was sold at least as early as 2006, and it's prior

11:02:18  5  art to all of the asserted patents, consistent with our

11:02:21  6  invalidity contentions.  And so we point to the table in

11:02:23  7  our invalidity contentions that lists the '541 patent as

11:02:28  8  being invalidated by the CFL foils in all of the asserted

11:02:33  9  patents.

11:02:33  10       We've walked through the different limitations,

11:02:36  11  including the tensile strength, surface roughness,

11:02:40  12  elongation in different limitations, and we showed that in

11:02:43  13  our interrogatory responses.

11:02:44  14       Now, on the -- there was a suggestion that we held

11:02:48  15  back samples of the -- of the prior art.  That's not the

11:02:50  16  case, Your Honor.  We did testing of the prior art, and

11:02:53  17  this testing is destructive testing.

11:02:57  18       But in May of 2025, in advance of expert reports,

11:03:01  19  SKn requested production of the mobile device foils, so

11:03:07  20  that includes the foils for Apple iPhone and Samsung

11:03:13  21  Galaxy, as well as the CFL foils.  And on that date, May

11:03:17  22  29th, 2025, we produced all of the prior art foils that we

11:03:21  23  had on that same day to SKn.

11:03:23  24       So in terms of the ability to do testing of those

11:03:29  25  foils, they were all disclosed on the very same date.  And

11:03:33    1    we explained it here.  Specifically, we included an

11:03:35    2    additional sample because they hadn't requested -- they

11:03:38    3    requested the -- a different sample of the CFL foil, we

11:03:42    4    explain.  In addition, we're producing these other foils,

11:03:46    5    and we were going to be doing testing on them.

11:03:48    6           So we were very clear at the time that we produced

11:03:51    7    any of our samples that we were going to be testing all of

11:03:54    8    these samples in advance of the expert report deadline,

11:03:58    9    which is when -- you know, we certainly had to disclose all

11:04:01    10    test results by the deadline for our initial expert report.

11:04:05    11    But our expert was still working on them.

11:04:10    12           Now, on the 4th, pursuant to the parties'

11:04:14    13    agreement, we served our supplemental invalidity

11:04:18    14    contentions.  And those included the testing that we --

11:04:21    15    that was not available before then and in some instances,

11:04:23    16    referred to testing that our expert was still doing, which

11:04:25    17    is consistent with the parties' agreement, as reflected in

11:04:30    18    the docket control order, which I show here.  We said we

11:04:36    19    would produce at that date all testing that had been done,

11:04:38    20    including by testing -- testifying experts.  And that if

11:04:42    21    additional tests were still being run, we would describe

11:04:44    22    them in detail.

11:04:45    23           And the purpose of this, Your Honor, was to allow

11:04:47    24    the parties to exchange rebuttal contentions, as well.  If

11:04:52    25    there were issues they had with the testing methodologies

11:04:54    1    of the other party, they were going to describe those and

11:04:58    2    be prepared to perform their own testing in connection with

11:05:02    3    the rebuttal expert report deadline, which was -- I forget

11:05:09    4    the exact date, but I believe it was late July, so almost

11:05:12    5    two months later, July 28th.

11:05:15    6         So, yeah, here it is, Your Honor, on July 28th,

11:05:19    7    SKn served a rebuttal expert report.

11:05:22    8         So this raises another issue, Your Honor.  This --

11:05:25    9    this came up after our initial expert report was already

11:05:28    10   served.  That's when we started talking about these

11:05:30    11   contentions.

11:05:32    12        And from our perspective, it demonstrates a severe

11:05:39    13   prejudice to us to start talking about the sufficiency of

11:05:42    14   contentions at this late stage in the case once we've

11:05:46    15   narrowed down our case in connection with our expert

11:05:47    16   reports.

11:05:48    17        So they filed their motion to strike on August

11:05:52    18   8th.

11:05:52    19        So in terms of diligence, Your Honor, you know, we

11:05:56    20   submit that we timely disclosed this theory.  And so the

11:06:00    21   diligence really relates to our testing.  And the testing

11:06:03    22   in this case was extensive.  Our testing expert has a team

11:06:07    23   of people, and they've been working essentially for the

11:06:11    24   whole year on this case testing numerous prior art samples.

11:06:15    25   They simply can't do them all at once.

| | | |
|---|---|---|
| 11:06:17 | 1 | So as you can see here, we updated our contentions |
| 11:06:21 | 2 | in -- in February with the testing that we had at that |
| 11:06:25 | 3 | time.  We produced all of the samples in May when SKn asked |
| 11:06:31 | 4 | for them, and then we served our supplemental contentions |
| 11:06:33 | 5 | in June. |
| 11:06:34 | 6 | But in terms of prejudice, there is -- there is no |
| 11:06:37 | 7 | prejudice.  There was -- there was time during this period |
| 11:06:41 | 8 | after we produced the foils and after we disclosed the |
| 11:06:45 | 9 | theories, clearly in 2024, there were depositions that were |
| 11:06:51 | 10 | taken.  But the time between the production of the foils |
| 11:06:54 | 11 | and the rebuttal report was nearly two months.  So there |
| 11:06:58 | 12 | was time to test those and do any rebuttal testing that |
| 11:07:01 | 13 | needed to be done. |
| 11:07:03 | 14 | And in terms of the depositions, there were -- |
| 11:07:05 | 15 | there absolutely were questions about the 10 and the 12 |
| 11:07:08 | 16 | micron foils in those depositions. |
| 11:07:10 | 17 | Now, there wouldn't be questions for a fact |
| 11:07:14 | 18 | witness about the testing that was performed on those foils |
| 11:07:18 | 19 | because the fact witnesses did not perform the testing. |
| 11:07:21 | 20 | The testing was done by our testing expert, |
| 11:07:27 | 21 | Mr. Kaschmitter.  He was deposed after the deadline for |
| 11:07:30 | 22 | rebuttal expert reports.  So in between that July 28th date |
| 11:07:34 | 23 | and the August 8th date is when Mr. Kaschmitter was |
| 11:07:38 | 24 | deposed.  That's who you would need to ask questions about |
| 11:07:41 | 25 | the testing to. |

11:07:42  1    But in terms of Mr. Streel, the CFL employee who

11:07:47  2    was deposed in May and in June, he was asked questions

11:07:50  3    about sales of these 10 and 12 micron foils, and as was

11:07:57  4    Ms. Godon, the employee of a French battery company called

11:08:02  5    ▓▓▓▓  And that's who retained the samples that I showed

11:08:06  6    earlier in the slides that we produced on August 23 of

11:08:09  7    2024.

11:08:09  8    And here, it's very hard to read, Your Honor, but

11:08:16  9    suffice it to say, SKn's expert had a chance to consider

11:08:22  10   these foils and address them in his rebuttal report.  If he

11:08:26  11   wanted to do rebuttal testing on them, he absolutely had

11:08:29  12   time to do that.  His report was due on July 28th.

11:08:32  13   If SKn wanted more time to do it, they could have

11:08:36  14   asked, but this didn't come up.  There was no threat to

11:08:40  15   move to strike.  There was no request to amend our

11:08:42  16   contentions at any time until after the expert reports came

11:08:45  17   in.

11:08:45  18   So, you know, I don't have a slide on -- on

11:08:49  19   prejudice to us, but really it comes down to the

11:08:52  20   importance.  So the importance factor, these CFL foils are

11:08:56  21   incredibly important to our defenses in this case.

11:09:01  22   So we have a discussion of the prior art here, and

11:09:05  23   our expert, Dr. Arnold, he opines that the asserted patents

11:09:11  24   are invalid based on prior art that comes from mobile

11:09:13  25   devices.  So an Apple iPhone, a Samsung Galaxy, you crack

| | | |
|---|---|---|
| 11:09:20 | 1 | open the battery, and you test those foils. |
| 11:09:23 | 2 | SKn argues that we don't know whether the battery |
| 11:09:25 | 3 | that was in those products is the original battery, and |
| 11:09:28 | 4 | they argue that the process of making the battery actually |
| 11:09:33 | 5 | impacts the structure of the foil.  So they have a number |
| 11:09:36 | 6 | of arguments and disputes. |
| 11:09:38 | 7 | To be clear, we disagree with those arguments, and |
| 11:09:41 | 8 | we have responses to them, but these CFL foils are raw |
| 11:09:47 | 9 | copper foil that has never been put into a battery.  It was |
| 11:09:51 | 10 | simply retained by CFL in the one case and in the other |
| 11:09:55 | 11 | case by CFL's customer ███████ |
| 11:10:00 | 12 | But these foils also are irrelevant because they |
| 11:10:03 | 13 | show -- they demonstrate intention in SKn's case, which is |
| 11:10:07 | 14 | they're essentially accusing something that's been done |
| 11:10:09 | 15 | before.  The current battery copper foils are made by |
| 11:10:13 | 16 | materially the same processes as the CFL foils. |
| 11:10:18 | 17 | Our company, Volta, obtained the technology to |
| 11:10:22 | 18 | make the foils from its subsidiary, CFL, which it bought in |
| 11:10:28 | 19 | 2020.  And it puts tension on this notion of copying and |
| 11:10:32 | 20 | that there's some sort of bad act that was done. |
| 11:10:35 | 21 | It's very important for us to be able to show the |
| 11:10:37 | 22 | jury we've been making these foils since before 2010, we've |
| 11:10:40 | 23 | tested them, and when you look at the test results, they |
| 11:10:44 | 24 | invalidate the asserted patents, and they meet the |
| 11:10:47 | 25 | numerical limitations.  To the extent that there's |

11:10:50  1    infringement, there is clearly invalidity.

11:10:54  2        So these are really important to our case, Your

11:10:56  3    Honor.  And in the timing of -- the timing of the motion to

11:10:59  4    strike is really problematic because it came after these

11:11:05  5    expert reports were served at a time when there's a severe

11:11:10  6    prejudice to Volta that can't be cured at this stage if the

11:11:14  7    motion were to be granted.

11:11:15  8        Now, in terms of Local Rule 3-6, I highlight this

11:11:21  9    just to show that with respect to the asserted patents,

11:11:25  10   we've alleged that they were indefinite.  We also had some

11:11:30  11   claim construction disputes.  Some of those were resolved

11:11:34  12   during the claim construction hearing and in the claim

11:11:36  13   construction order.

11:11:38  14       And what we show here, Your Honor, is that testing

11:11:41  15   of the CFL-18 foil would be invalidating under the way we

11:11:47  16   were previously interpreting Claim 1 of the '090 patent,

11:11:51  17   which was using this formula meter reference length, but

11:11:51  18   the claim construction order points to a 1 centimeter

11:11:51  19   reference length, and the CFL-18 foil does not invalidate

11:12:03  20   under that 1 centimeter reference length.

11:12:05  21       So as a result, that CFL-18 is not invalidating of

11:12:11  22   the '090 patent, and we did not pursue it.  We pursued the

11:12:13  23   10 and the 12, which invalidate under either the --

11:12:18  24   under -- on both sides under the per centimeter reference

11:12:21  25   length that was ordered in the claim construction order.

| | | |
|---|---|---|
| 11:12:24 | 1 | So there is a -- that's an independent reason, but |
| 11:12:28 | 2 | frankly, Your Honor, it really boils down to whether we |
| 11:12:31 | 3 | disclosed these theories previously.  And our position is |
| 11:12:34 | 4 | that we did.  If you don't believe they were disclosed |
| 11:12:37 | 5 | previously, we were diligent, and there was no prejudice. |
| 11:12:40 | 6 | So those are essentially three independent bases |
| 11:12:43 | 7 | to deny the motion, Your Honor. |
| 11:12:46 | 8 | THE COURT:  All right. |
| 11:12:47 | 9 | MR. TISHMAN:  That's all I have.  Do you have any |
| 11:12:49 | 10 | questions, Your Honor? |
| 11:12:50 | 11 | THE COURT:  Not at the moment, Mr. Tishman.  Thank |
| 11:12:51 | 12 | you. |
| 11:12:51 | 13 | MR. TISHMAN:  Okay.  Thank you. |
| 11:13:01 | 14 | MR. YIN:  Brief response? |
| 11:13:02 | 15 | THE COURT:  Yes. |
| 11:13:24 | 16 | MR. YIN:  Your Honor, it doesn't seem like our |
| 11:13:26 | 17 | PowerPoint is working, so I'm just going to talk through |
| 11:13:29 | 18 | some of the points. |
| 11:13:30 | 19 | Number one, I think Mr. Tishman referred to a few |
| 11:13:36 | 20 | times that they have tested the samples as they became |
| 11:13:39 | 21 | available to them -- as they became available to us. |
| 11:13:42 | 22 | But the samples, as Your Honor saw from our slides |
| 11:13:46 | 23 | earlier, had been available to Defendants all along.  It |
| 11:13:50 | 24 | was in their possession since 2020 for the CFL-10.  They |
| 11:13:54 | 25 | received the CFL-12 and 18 in April of 2024.  So for an |

11:13:59  1  entire year, it was in their possession.  It was available

11:14:02  2  to them.  And no testing.

11:14:06  3      And I would just highlight for Your Honor the

11:14:10  4  Estech versus Carvana case, and this was cited in both

11:14:13  5  parties' brief.  There the Court found not only that lack

11:14:16  6  of diligence itself is sufficient to deny a motion, but

11:14:21  7  also found that the explanation given by the Defendant in

11:14:23  8  that case simply showed that they did not devote enough

11:14:28  9  resources necessary to investigate the prior art.  It was

11:14:33  10  Defendants' burden to investigate the prior art to support

11:14:37  11  their invalidity case.  They did not devote enough

11:14:41  12  resources, and that's the same situation here.

11:14:42  13      THE COURT:  Mr. Yin, the presentation I heard from

11:14:44  14  the Defendants indicated that they believe they did

11:14:48  15  disclose the 10 and the 12 micron thicknesses back in

11:14:56  16  August of 2024 as part of their invalidity contentions.

11:15:02  17  What is your response to that?

11:15:06  18      MR. YIN:  Thank you, Your Honor.

11:15:07  19      So that's actually coming up to my second point is

11:15:11  20  in response to Your Honor's question, based on

11:15:14  21  Mr. Tishman's presentation just now, we did not see any

11:15:19  22  claim limitation-by-limitation mapping of either 10 or 12

11:15:24  23  in any of their earlier contentions.  That's number one.

11:15:27  24      Number two, for the CFL-10 foil, they couldn't

11:15:31  25  have disclosed it because Defendants' story was the CFL-10

11:15:36  1   foils didn't come into their possession until Mr. Streel

11:15:40  2   showed up on May 1st, or maybe the day before his

11:15:44  3   deposition on May 1st of 2025.  That was the Streel binder

11:15:49  4   folder.  So the suggestion that Defendants had disclosed

11:15:54  5   CFL-10 in August of 2024, in February of 2025 simply is not

11:16:00  6   supported by the facts.

11:16:02  7          THE COURT:  Well, look at their Slide 7.  That's

11:16:07  8   what they offered as an indication that they did disclose

11:16:14  9   the 10 and the 12 as prior art back in August of last year.

11:16:21  10          MR. YIN:  Your Honor, so these are sales records

11:16:24  11   from CFL to ███████ and there's -- first of all, let me

11:16:29  12   address CFL-10 first.

11:16:30  13          The CFL-10 foil reflected on the right-hand side

11:16:35  14   of Slide 7 was allegedly sold to ██████

11:16:39  15          Now, this piece of copper foil, it's true, it was

11:16:42  16   in Defendants' possession in April 2024.  ██████ sent them.

11:16:47  17   But curiously they never tested it, or according to

11:16:50  18   Defendants, they never tested it.  This is a different foil

11:16:55  19   than Mr. Streel's CFL-10 found in his binder and what

11:17:01  20   Defendants rely on as prior art in this case.  So I'll

11:17:05  21   submit, Your Honor, that this doesn't show CFL-10 was

11:17:08  22   disclosed.

11:17:09  23          THE COURT:  Well, were the letters that are on

11:17:15  24   Slide 7, were those part of the August invalidity

11:17:20  25   contentions from last year?

| | | |
|---|---|---|
| 11:17:22 | 1 | MR. YIN:  Yes, these two documents were cited in a |
| 11:17:24 | 2 | footnote in the August 2024 contentions. |
| 11:17:34 | 3 | THE COURT:  So why don't they constitute notice of |
| 11:17:38 | 4 | Volta's reliance on the 10 and 12 thicknesses as |
| 11:17:42 | 5 | invalidating prior art? |
| 11:17:44 | 6 | MR. YIN:  Because, Your Honor, the mere suggestion |
| 11:17:45 | 7 | of the existence of some prior art is simply insufficient. |
| 11:17:48 | 8 | And I would direct Your Honor to the Realtime Data versus |
| 11:17:52 | 9 | Packeteer case, and I think it's cited in our motion |
| 11:17:55 | 10 | briefing.  In there, this Court has found that Defendants |
| 11:17:59 | 11 | required to submit invalidity charts to provide notice on |
| 11:18:04 | 12 | how each element is met.  I would submit to Your Honor that |
| 11:18:08 | 13 | these sales records can't rise to the level of adequate |
| 11:18:11 | 14 | notice to SKn. |
| 11:18:14 | 15 | THE COURT:  You know, the sufficiency of a |
| 11:18:15 | 16 | contention is a little different than whether there was |
| 11:18:20 | 17 | disclosure of something as prior art.  And if you felt that |
| 11:18:31 | 18 | these contentions were not sufficient, did you raise that |
| 11:18:37 | 19 | with the other side? |
| 11:18:41 | 20 | MR. YIN:  Your Honor, there was no indication that |
| 11:18:43 | 21 | Defendants were going to rely on the CFL-10 or 12 at the |
| 11:18:46 | 22 | time.  As I mentioned and Your Honor may recall, the August |
| 11:18:51 | 23 | 2024 contentions provided no chart, and their subsequent |
| 11:18:56 | 24 | contention, February 2025, only charted CFL-12 -- CFL-18, |
| 11:19:01 | 25 | I'm sorry. |

11:19:03    1    So the only notice we received was the Defendants

11:19:07    2    contended CFL-18 met each element of the claim, which we

11:19:11    3    disagreed, but we at least understood that to be their

11:19:14    4    contentions.  We had no -- no reason to believe that they

11:19:21    5    also contended CFL-10 and 12, which are prior art in their

11:19:26    6    own possession, to also meet the elements of the claim, so

11:19:31    7    we have no way to verify that either because the samples

11:19:31    8    were in their possession.

11:19:32    9    THE COURT:  Why would the 10 and the 12 be in

11:19:34    10   their invalidity contentions if they were not contending

11:19:41    11   that they were invalidating prior art?

11:19:44    12   MR. YIN:  Well, Defendants' invalidity contentions

11:19:47    13   did not really explain the purpose behind these documents,

11:19:49    14   but we do see CFL-18 cited in the document, as Your Honor

11:19:54    15   can see from Page 7.  So we had understood at the time that

11:19:58    16   this was a record of their suggestion that CFL-18 had been

11:20:03    17   sold in March, or whenever this document was published.

11:20:09    18   But we did not understand that the remaining parts of the

11:20:13    19   document, which were not called out anywhere in their

11:20:16    20   contentions or charts, to be an independent basis of a

11:20:20    21   different prior art that was never charted.

11:20:23    22   THE COURT:  Was CFL-18 charted in the August

11:20:28    23   invalidity contentions?

11:20:30    24   MR. YIN:  No, it was not, Your Honor.

11:20:32    25   THE COURT:  So why would you think that they were

| | |
|---|---|
| 11:20:34 | 1 |
| 11:20:39 | 2 |
| 11:20:41 | 3 |
| 11:20:44 | 4 |
| 11:20:47 | 5 |
| 11:20:52 | 6 |
| 11:20:55 | 7 |
| 11:21:02 | 8 |
| 11:21:04 | 9 |
| 11:21:06 | 10 |
| 11:21:10 | 11 |
| 11:21:13 | 12 |
| 11:21:17 | 13 |
| 11:21:19 | 14 |
| 11:21:20 | 15 |
| 11:21:21 | 16 |
| 11:21:27 | 17 |
| 11:21:31 | 18 |
| 11:21:36 | 19 |
| 11:21:42 | 20 |
| 11:21:45 | 21 |
| 11:21:48 | 22 |
| 11:21:53 | 23 |
| 11:22:08 | 24 |
| 11:22:10 | 25 |

relying on 18 as opposed to 10 and 12?

MR. YIN:  I think our understanding was as of February of 2025 when they finally charted CFL-18, it was our understanding that the earlier citation to these sales records were directed to CFL-18 and not 10 or 12.

THE COURT:  So at the time you got the contentions, you felt they were insufficient?

MR. YIN:  We didn't think it was our burden to show whether their contentions were sufficient or not.  We understood their contentions to be that CFL-18 was the piece of prior art they intended to rely on, and we looked at their specific, you know, contentions with regard to that piece of prior art, not any other prior art that was not disclosed.

THE COURT:  Well, that would be something you decided in February.  What was your impression from August of 2024 to February of 2025?

MR. YIN:  In August 2024, we had not understood that Defendants even had possession of this prior art yet.  This prior art, despite being in Defendants' possession -- physical possession since April of 2024, they were not shown to us in a chart form, as they did for the other prior art, until February 2025.

THE COURT:  I think the Defendants also pointed out this -- it's on their Slide 6 -- something that was

11:22:17   1   Exhibit A-24, I guess, to their invalidity contentions that

11:22:23   2   referred to CFL samples simply as a whole without any

11:22:32   3   reference to the thickness.

11:22:35   4        MR. YIN:  Yes, Your Honor.  So this goes back to

11:22:37   5   the point earlier about whether CFL samples are considered

11:22:41   6   a single piece of prior art or they're distinct pieces of

11:22:45   7   prior art.

11:22:47   8        And as Your Honor can see from -- I couldn't

11:22:49   9   really show it, I apologize.  But on Slide 3 of our -- our

11:22:54   10  PowerPoint deck, we showed the different pieces of prior

11:22:58   11  art, 10, 12, and 18.  They were completely different pieces

11:23:03   12  of prior art, sold to different customers, different

11:23:08   13  products, they have different serial numbers, and

11:23:10   14  importantly, both of Defendants' experts testified that

11:23:14   15  they are different prior art.

11:23:16   16        Mr. Kaschmitter, their testing expert, tested

11:23:20   17  CFL-10 and 12 as distinct pieces of prior art in parallel

11:23:24   18  to the iPhone and the iPad.

11:23:27   19        THE COURT:  Did the Plaintiff ever question the

11:23:35   20  Defendant about what thicknesses of CFL the Defendant was

11:23:39   21  relying upon as prior art?

11:23:44   22        MR. YIN:  Frankly, Your Honor, we had not had

11:23:49   23  sufficient notice to understand that -- you know, what the

11:23:52   24  nature of the CFL prior art was because in August of 2024,

11:23:57   25  discovery had only commenced for about four months.  A lot

| | |
|---|---|
| 11:24:01 | 1 |
| 11:24:04 | 2 |
| 11:24:08 | 3 |
| 11:24:16 | 4 |
| 11:24:20 | 5 |

1  of the documents had not been produced yet.  And, again,

2  the prior art was buried amongst 32 other prior art

3  systems.  And, again -- which are in themselves part of 24

4  other prior art, including patent and printed patent prior

5  art.

6        So our understanding at the time was Defendants

7  were focusing on some other pieces of prior art, and not

8  these ones.  And it's clear from their testing when they

9  spent the entirety of 2024 testing the iPhone, the iPad,

10  the Samsung Electronics devices, and that, again, goes to

11  the importance factor.  If the CFL prior art were truly

12  important, as Mr. Tishman suggested, then Defendants would

13  have focused or prioritized the prior art in their own

14  possession and not the copper foils extracted from the

15  batteries.

16        THE COURT:  So what you're saying is that the

17  first time you understood that they were relying on the 10

18  and 12 micron thicknesses was in the -- their opening

19  expert report?

20        MR. YIN:  The first time we understood they were

21  also relying on the 10 and 12, in addition to the 18, was

22  in the June 4th second supplemental invalidity contentions

23  where they --

24        THE COURT:  All right.  And at that point, did you

25  attempt to perform testing on those thicknesses?

11:25:37  1          MR. YIN:  We requested a sample.  I'd have to, you

11:25:40  2    know, refer back to our record, Your Honor, to check when

11:25:43  3    exactly that separate request was sent in.  But we have

11:25:46  4    requested samples since the outset of fact discovery.

11:25:51  5          The RFP letter went out, I believe, in July of

11:25:55  6    2024, which is right after fact discovery had commenced,

11:25:59  7    but we did not received the samples until May 29th of 2025,

11:26:03  8    almost a year later.

11:26:07  9          THE COURT:  So you received the samples at the end

11:26:09  10   of May.  You received the information in early June that

11:26:15  11   they were relying on them.  Have you made any effort to

11:26:20  12   test those samples?

11:26:22  13          MR. YIN:  We did, Your Honor.  In the limited time

11:26:24  14   that we had, juggling the close of fact discovery

11:26:27  15   depositions and two expert reports, our expert did test

11:26:30  16   several samples.  And those were, I believe, produced and

11:26:34  17   they also included or referenced in Dr. -- in our technical

11:26:38  18   expert's deposition.

11:26:39  19          THE COURT:  So what else would you have done if

11:26:41  20   you had earlier notice about the reliance on 10 and 12?

11:26:46  21          MR. YIN:  If we had been given samples of the

11:26:51  22   CFL-10 and 12 samples to test and been given sufficient

11:26:54  23   notice early on that these were the prior art samples that

11:26:58  24   Defendants truly rely on, we would have performed the

11:27:01  25   testing ahead of time and asked Mr. Streel questions.

```
11:27:04    1          Now, I think Mr. Tishman had suggested that it is
11:27:07    2     improper to ask testing results to -- to pose questions
11:27:12    3     about testing results to fact witnesses, but Mr. Streel is
11:27:16    4     a technical witness.  He's going to be the front and center
11:27:19    5     in Defendants' case as the mastermind behind the accused
11:27:23    6     products.  So he certainly is qualified to testify about
11:27:27    7     the testing results and the characteristics.
11:27:31    8          So with the testing results we could have
11:27:35    9     performed on the 10 and 12 samples, we would have explored
11:27:39   10     those more with Mr. Streel.
11:27:45   11          THE COURT:  And I understand there were questions
11:27:47   12     asked to Mr. Streel about the 10 and 12 thicknesses.  What
11:27:53   13     else would you have inquired of him?
11:27:56   14          MR. YIN:  So there's a range of different physical
11:28:01   15     properties being claimed in the asserted patents going from
11:28:04   16     surface roughness to tensile strength, heat properties,
11:28:10   17     elongation.  There's a test called AAS that goes to the
11:28:15   18     coating supply to the copper foils and a range of other
11:28:20   19     properties.
11:28:20   20          If we had had the opportunity to test CFL-10 and
11:28:24   21     12, we could have put data in front of Mr. Streel and
11:28:27   22     explored any differences between those data and the accused
11:28:30   23     products to rebut Defendants' apparent theory now that they
11:28:37   24     had been practicing the same CFL technology since the
11:28:44   25     beginning of early 2000s or maybe even earlier.  Those were
```

11:28:51  1  all lost opportunities because we were never given a chance

11:28:54  2  to perform testing on the CFL-10 and 12 early on in

11:28:57  3  discovery.

11:28:58  4       THE COURT:  Did you ask those questions concerning

11:28:59  5  the 18 micron thickness?

11:29:02  6       MR. YIN:  I don't believe we did because the

11:29:09  7  CFL-18 foil was frankly not a terribly strong piece of

11:29:14  8  prior art.  So given the limited time, we did not explore

11:29:18  9  that.  CFL-18 failed a number of parameters claimed in the

11:29:26  10  patent, so we understood that Defendants were relying on

11:29:29  11  one of their earlier -- other prior art that they had

11:29:32  12  disclosed instead of CFL-18.  But the CFL-10 and 12 that

11:29:36  13  came later really came as a huge surprise.

11:29:46  14       THE COURT:  One of the depositions of Mr. Streel

11:29:50  15  was after the June 4 contentions clarifying that they were

11:29:57  16  relying on 10 and 12?

11:30:00  17       MR. YIN:  I don't believe that's the case, Your

11:30:03  18  Honor.  I believe Mr. Streel was deposed on May 1st for the

11:30:07  19  first time and June 2nd on the second time.  Both occurred

11:30:10  20  before the June 4th disclosure.

11:30:13  21       THE COURT:  All right.  And do you expect

11:30:15  22  Mr. Streel to be a witness at trial?

11:30:21  23       MR. YIN:  That is our understanding, Your Honor,

11:30:22  24  that Defendants expect a defense at trial -- a theme at

11:30:27  25  trial really was that they had been practicing the CFL

11:30:30    1    technology, that they had licensed the CFL technology from

11:30:33    2    the get-go.

11:30:34    3         And just to briefly address Mr. Tishman's point

11:30:38    4    about importance, again, there's nothing preventing them

11:30:40    5    from running the same story at trial, but the prior art

11:30:44    6    testing itself, which had been disclosed late, is severely

11:30:48    7    prejudicial to SKn and should be stricken.

11:30:50    8         THE COURT:  All right.

11:30:52    9         MR. YIN:  Thank you, Your Honor.

11:30:53   10         THE COURT:  Thank you, Mr. Yin.

11:31:07   11         MR. TISHMAN:  May I have our slides, please?

11:31:09   12         Your Honor, I just want to respond to a couple of

11:31:12   13    brief points.

11:31:12   14         First, one of the last things that Mr. Yin said is

11:31:15   15    that the testing is really what should be stricken.  But

11:31:18   16    that was clearly allowed for in these June 4th contentions.

11:31:22   17    We were to disclose additional testing as it becomes

11:31:24   18    available.

11:31:25   19         Now, there was a response by Mr. Yin to something

11:31:28   20    I said, and I think there may have been a misunderstanding.

11:31:31   21    I was not suggesting, Your Honor, that we did all of the

11:31:34   22    tests at the very outset of the case because that wouldn't

11:31:37   23    have been possible.  We did them in a linear fashion as we

11:31:41   24    could and as the resources were available.  It's very time

11:31:44   25    consuming.

11:31:45  1      You heard Mr. Yin describe the atomic absorption,

11:31:50  2  AAS test, the profilometer test.  And Your Honor knows from

11:31:55  3  the claim construction process that it's very complex in

11:31:57  4  this case, and the testing is very time consuming.

11:31:59  5      So we disclosed the test results as soon as the

11:32:02  6  test results were available to us.  And we disclosed this

11:32:05  7  theory at the very outset of the case.

11:32:07  8      There was a suggestion that SKn didn't know that

11:32:11  9  we had the 10 and the 12, but we showed in our slides, Your

11:32:16  10  Honor -- this is in Exhibit 2, and this was also in

11:32:20  11  Mr. Yin's slide.  This was produced -- what's on the left

11:32:22  12  side and the right side, these were produced on August 23

11:32:27  13  of 2024 on the deadline for initial invalidity contentions

11:32:32  14  with the accompanying document production.  And this --

11:32:36  15  these were labeled 10 micron, 18 micron, 12 micron.  And

11:32:42  16  then there was -- the thickness is also provided in these

11:32:45  17  data sheets that we relied on.

11:32:48  18      So really it comes down to how -- how much detail

11:32:51  19  did they have in our -- in our contentions.  And if they

11:32:54  20  thought they needed more detail, they certainly could have

11:32:57  21  asked.  If they thought they needed more information from

11:33:00  22  Mr. Streel, they could have asked.  If they thought they

11:33:02  23  needed more interrogatories, they could have asked.  They

11:33:06  24  could have moved to compel.

11:33:07  25      But instead, they waited until our expert report

11:33:10    1    already went in and the importance of CFL to our case

11:33:14    2    became apparent, and then they moved to strike.

11:33:18    3          And, Your Honor, we submit that it's just too late

11:33:20    4    in the case to be -- to be striking these -- these prior

11:33:24    5    art reference that was disclosed from the outset of the

11:33:28    6    case.

11:33:29    7          With that, I'll turn it over -- if you have any

11:33:32    8    questions, Your Honor.

11:33:33    9          THE COURT:  No, not at this time, Mr. Tishman.

11:33:36   10          MR. TISHMAN:  Okay.  Thank you, Your Honor.

11:33:37   11          THE COURT:

11:33:39   12          MR. YIN:  Your Honor, I just have one brief point,

11:33:42   13    if I could?

11:33:46   14          THE COURT:  All right.

11:33:46   15          MR. YIN:  Can we have the slide up just now --

11:33:54   16    sorry, the slide showing Exhibit 2?

11:33:58   17          Your Honor, so I think Mr. Tishman was suggesting

11:34:05   18    that these pictures of the samples were provided to us

11:34:08   19    early on.  I believe the sample on the top right corner is

11:34:11   20    the 10 micron that Mr. Tishman was referring to, but this

11:34:14   21    is not the CFL-10 that Defendants rely on.

11:34:17   22          And curiously, despite the samples being in their

11:34:20   23    possession since April and August of 2024, they never

11:34:24   24    tested it, instead waited until April 30th, 2025, a year

11:34:31   25    later, to extract the copper foil from Mr. Streel,

1  allegedly, you know, showing up to his deposition with a

2  binder and tested that one.

3          And I want to point out that fact as, you know,

4  being pertinent to the fact that the samples that they're

5  relying on now are just completely different from what they

6  had initially purportedly disclosed.

7          THE COURT:  All right.

8          MR. YIN:  And that's all, Your Honor.

9          MR. TISHMAN:  Your Honor, just one second, and I

10  can respond to that.  As you can see here, Your Honor,

11  these are incredibly thin strips, and this was all we had.

12  And so, you know, that explains why we didn't test these

13  particular strips in terms of the testing that we needed to

14  do.  We needed bigger samples.

15          So we tested -- the one that we tested is that top

16  left.  It's a bigger sample.  Once we obtained a different

17  sample of the same CFL-10, we tested that, and we made it

18  available to the other side at the same point in time that

19  we received it.  The day that I saw that sample in the

20  binder, we made it available for inspection, Your Honor.

21          THE COURT:  All right.  I understand the

22  arguments, and I will consider them further and get rulings

23  out on these three motions.

24          So thank you.  Unless there's -- is there anything

25  further from the Plaintiff?

| | | |
|---|---|---|
| 11:35:49 | 1 | MR. DACUS:  No, Your Honor. |
| 11:35:50 | 2 | THE COURT:  Or the Defendant? |
| 11:35:51 | 3 | MR. GORHAM:  No, Your Honor. |
| 11:35:52 | 4 | THE COURT:  All right.  In that case, we're |
| 11:35:53 | 5 | adjourned.  Thank you. |
| 11:35:57 | 6 | COURT SECURITY OFFICER:  All rise. |
| 11:35:58 | 7 | (Hearing concluded at 11:35 a.m.) |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                                    CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes_____                9/3/2025___
     SHELLY HOLMES, CSR, TCRR                    Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25